UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| MEMORIAL HOSPITAL, ROXBOROUGH | : | |
| Debtor | : | Bankruptcy No. 04-18933bif |

_____

| | | |
|---|---|---|
| MEMORIAL HOSPITAL, ROXBOROUGH | : | |
| Plaintiff | : | |
| v. | : | |
| | : | |
| HOME HEALTH CORPORATION OF AMERICA, INC. | | Adversary No. 04-1059 |
| Defendant | : | |

_____

..................................................

OPINION

..................................................

The debtor, Memorial Hospital, Roxborough ("MHR"), has filed a

complaint alleging that Home Health Corporation of America, Inc. ("HHCA") breached

an asset purchase agreement by failing to pay the final $850,000 installment of the

purchase price. As will be discussed, HHCA purchased MHR's home health care

business, known as Roxborough Home Care Division ("RHC"), in January 2004. HHCA

paid MHR only $1 million of the promised $1.85 million, and does not deny that it did

not pay its remaining $850,000 installment. HHCA, however, asserts that it is excused

from further performance due to MHR's breach of certain contract provisions.[1]

_____

[1]Although MHR originally contended that this proceeding was a core matter to
which I could enter final judgment, I previously concluded that it did not involve a turnover
claim under 11 U.S.C. § 542, and was a simple breach of contract action under state law and thus
non-core. See generally Beard v. Braunstein, 914 F.2d 434, 444 (3d Cir. 1990). Therefore,
(continued...)

The parties have engaged in a lengthy trial covering five separate days, involving numerous exhibits and witnesses. Thereafter, each party submitted two detailed post-trial memoranda of law. Upon review of these submissions, it is apparent that, at bottom, HHCA contends that it obtained a much smaller business than it contracted for, and that MHR is legally responsible for that business reduction. MHR disagrees; the plaintiff maintains that it fulfilled all of its contractual obligations to HHCA and is entitled to full payment, with interest.

I now decide this contractual dispute against the following factual backdrop. In reciting the relevant facts, I observe that relatively few are truly disputed. Rather, the parties differ over the proper interpretation of those facts. Moreover, they disagree about the contractual allocation of risk, the appropriate application of the "adverse change" provisions of the contract, as well as the scope of the plaintiff's representations and warranties; moreover, to the extent that MHR did not fully comply with the terms of the contract, which MHR denies, the parties disagree about the measure of damages and the allocation of the burden of proof on that issue.

---

[1](...continued)
although MHR agreed to the entry of a final judgment in this forum, the defendant would also have to consent or I would be limited to issuing a recommendation to the District Court.

HHCA in its answer to plaintiff's complaint initially declined to consent to the entry of a final judgment in this bankruptcy court. See generally 28 U.S.C. § 157(c)(1). Thereafter, HHCA modified its position and did expressly consent to the entry of a final judgment pursuant to section 157(c)(2) and Fed. R. Bankr. P. 7012(b). See N.T. 5/18/06 at 3; Defendant's Unopposed Motion, filed June 17, 2005, at 5 n.1.

I.

I make the following findings of fact that are material to my resolution of this contract dispute.  In so doing, it was not necessary to address all of the factual issues posed by the parties.

1.  MHR is a Pennsylvania corporation that was, until December 2002, engaged in the operation of an acute care hospital in Philadelphia, as well as a home healthcare business.  Joint Pre-trial Statement ("JPS"), ¶ 1.[2]  In December 2002, MHR sold its hospital, Roxborough Memorial Hospital, to Tenet Healthcare Systems.  JPS, ¶ 20.  In early 2003, MHR engaged Mr. Mark Feldman as its president and/or chief executive officer for the purpose of selling the separate home health care business, known as the Roxborough Home Care Division ("RHC").  He anticipated a liquidation value for this business between $750,000 and $1,500,000.  JPS, ¶ 21; see Ex. D-5; N.T. 5/25/06 at 105-08.

2.  In June 2003, Mr. Feldman sent HHCA's chief executive officer, Mr. David Geller, a letter enclosing certain financial and other information concerning RHC and solicited a purchase offer.  JPS, ¶ 24; see Ex. D-6.  In July 2003, HHCA's chief financial officer, Mr. Richard E. Furtek, advised Mr. Feldman that HHCA had sufficient assets to complete a sale transaction quickly and requested additional information to assist HHCA in assessing the potential acquisition of MHR's business.  JPS, ¶ 25; see Ex. D-7.

---

[2]The parties' joint pretrial statement contained, inter alia, 71 statements of uncontested facts.  Those stipulated facts shall be cited as "JPS, ¶ _."

3.  In August 2003, based upon the information provided by MHR, HHCA made a non-binding expression of interest in purchasing RHC at a preliminary valuation of $2 million to $2.5 million, less any amounts owed for Medicare or Medicaid overpayments or obligations owing to other federal or state agencies; moreover, the proposal was subject to change after due diligence.  JPS, ¶ 27; <u>see</u> Exs. P-13; D-9; N.T. 5/18/06 at 214.

4.  MHR had received four other expressions of interest for RHC, with those proposals ranging from approximately $700,000 to $1,000,000.  JPS, ¶ 28; <u>see</u> Ex. D-10.  Sometime between August 21, 2003 and September 9, 2003, Mr. Feldman advised Mr. Geller that HHCA's preliminary non-binding expression of interest was the highest proposal MHR had received and that MHR wished to proceed to a firm offer and sale. JPS, ¶ 29.

5.  On September 11, 2003, MHR and HHCA signed a nonbinding "Exclusivity Letter" relating to the acquisition of RHC, pursuant to which HHCA made a good faith deposit in the amount of $100,000.  JPS, ¶ 31; <u>see</u> Ex. D-11.[3]  This letter agreement, <u>inter alia</u>, gave HHCA the right to conduct due diligence.  Specifically, it stated: "Promptly following the date of your execution and delivery of this letter . . .  and payment of the Good Faith Deposit . . . MHR will, at reasonable times and locations, provide HHCA . . . with access to all information in MHR's possession, or reasonably available to MHR, respecting the Business and the Home Health Assets and will make senior management of the Business available to HHCA."  Ex. D-11.

---

[3]The letter, sent by MHR, is dated September 9, 2003, and HHCA signed it on September 11, 2003.

6. Beginning not later than September 4, 2003, HHCA conducted due diligence of RHC's business and financial condition in accordance with an outline HHCA's senior management had prepared. Exs. P-8, P-9; N.T. 5/15/06 at 62-63.

7. Mr. Geller is a certified public accountant who had been employed at a large accounting firm for many years prior to becoming chief financial officer of another healthcare business. N.T. 5/18/06 at 210. He became chief financial officer of HHCA in July 1998, and became its chief executive officer in February 1999. Id. As CEO, Mr. Geller is responsible for "all strategic planning, all financial performance, all operating performance and all facets of the operations of HHCA." Id.

8. Mr. Furtek also is a certified public accountant. N.T. 5/15/06 at 29. He came to HHCA in 1997 as director of mergers and acquisitions, and became HHCA's chief financial officer in January 2002. Id. Prior to joining HHCA, Mr. Furtek worked at Coopers & Lybrand where he worked on various acquisitions and transactions. N.T. 5/15/06 at 30. As CFO, Mr. Furtek is responsible for "the overall financial operations and administration at the company. Additionally, [he] take[s] part in transactions, such as [the] Roxborough transaction[,] overseeing and working through such transactions." N.T. 5/15/06 at 29-30.

9. Mr. John Brunner has worked for HHCA since 1995 and currently serves as the director of finance for HHCA. N.T. 5/22/06 at 8. He, among others, assisted Mr. Furtek in the due diligence effort involving RHC by collecting "the financial statements, underlying statistics and visits and referrals that would support the financial statements and then build a forecast, a proforma forecast of what we would have

5

anticipated that acquisition [of RHC] to produce." N.T. 5/22/06 at 9. He reported directly to Mr. Furtek.

10. Ms. Colleen Lederer is HHCA's senior vice president of professional services. N.T. 5/18/06 at 6. She oversees clinical operations and marketing, supervises Medicare compliance, and has budgetary responsibility. Id. at 6-7.

11. HHCA's due diligence of RHC was undertaken at the direction of Mr. Furtek, N.T. 5/15/06 at 30, 34, 62, utilizing the efforts of employees such as Mr. Brunner, Ms. Lederer and Ms. Pine, executive director of HHCA. One of the purposes of HHCA's due diligence was to verify the financial information that MHR had provided. N.T. 5/15/06 at 62. HHCA acknowledged at trial that it was not aware of any material information it requested that MHR did not provide, although Mr. Geller believes that HHCA did not request new patient referral information concerning the months of November 2003 and December 2003 until after the asset purchase sale had closed. N.T. 5/15/06 at 63; N.T. 5/22/06 at 23, 51. HHCA did not discover anything during its due diligence investigation that caused it to believe that there were any "major problems" with RHC's business. N.T. 5/15/06 at 52; N.T. 5/18/06 at 215.

12. On November 21, 2003, after HHCA had investigated the financial affairs of RHC, and after continued negotiations between Mr. Geller and Mr. Feldman, MHR and HHCA entered into an Asset Purchase Agreement ("APA") for the sale of RHC. JPS, ¶ 4; see Ex. D-1. Under this agreement, HHCA promised to pay MHR $1,850,000; with $1,500,000 to be paid at closing and $350,000 to be paid 180 days later. Ex. D-1, ¶ 2.5.

6

13. Although HHCA's preliminary non-binding expression of interest had stated that it valued the business at $2-2.5 million "less any amounts owed to the Centers for Medicare and Medicaid Services . . . or other federal or state government agencies to whom the Business owes money and whose liabilities must be assumed in conjunction with this proposed transaction[,]" Ex. D-9, HHCA did not assume any of MHR's Medicare or Medicaid services liabilities under the APA. See Ex. D-1, ¶ 2.4 and Schedule 2.1(c). Furthermore, HHCA utilized a nurses' strike at Medical College of Pennsylvania (MCP) as a "bargaining chip" to reduce the purchase price paid for RHC below the amount originally expressed in its offer of interest.[4]

14. An attachment to the APA disclosed RHC's actual monthly revenue from January 2003 to September 2003, and projected net revenue for 2003 by averaging the January-September revenue. Ex. D-1 (Schedule 4.5). Average monthly net revenue was projected to be $272,662. This attachment also included audited financial statements for the years ended June 30, 2000, 2001 and 2002. Id. RHC's actual monthly net revenue

---

[4]Mr. Geller testified:

We had picked—we had agreed to the two million dollar figure, and then shortly before we were going to sign the agreement, it was in the newspaper that there was a strike, a nurses strike at MCP.

I was a little bit concerned about the nursing strike, but I didn't really believe it would have any long-term value—any effect on the long-term value of the Roxborough home care division.

However, I also used it [as] a bargaining chip and I applied some negotiating pressure to Mark Feldman, and I indicated I felt there was a problem and I was successfully able to lower the purchase price and negotiate it from two million down to a million eight-fifty.

N.T. 5/18/06, at 221-22.

7

for October 2003, November 2003, and December 2003[5] turned out to be $304,576,

$255,888, and $257,147 respectively.  Ex. P-98.  Thus, the average monthly net income

for the final quarter was $272,537.

15.  Mr. Furtek, who was involved in determining HHCA's final purchase

offer, explained that HHCA valued the business by considering where RHC was located

in relation to HHCA's existing business, its revenue stream, its patient census, and its

sources of payment.  N.T. 5/15/06 at 35-36.  Other factors considered by HHCA in its

evaluation of  RHC's worth were that the entity was a going concern, that its past

operations could serve as a "guide of future prospects," that certain of its expenses could

be reduced by HHCA after purchase, and that there was not a significant overlap of

referral sources.  Id. at 70, 77.[6]

16.  The final purchase price, as well as other contract terms, were

negotiated by Messrs. Geller and Feldman.  Although HHCA calculated RHC's

EBITDA,[7] it used that number solely as a check on its independent evaluation of worth.

Id. at 71-72.  In formulating its preliminary expression of interest to MHR, HHCA

appears to have used an EBITDA of $430,000 and a multipler range of 4.65 to 5.81.  Ex.

---

[5]Exhibit P-98 records the last month of revenue as measured from December 3, 2003 to January 5, 2004.

[6]It is possible that other parties that had expressed an interest in purchasing RHC had overlapping referral sources or territories that made the business less attractive than it was to HHCA.

[7]EBITDA is an acronym for "earnings before interest, taxes, depreciation and amortization."

P-17.  Its accepted purchase offer of $1,850,000 would have yielded an EBITDA

multiplier of 4.30, assuming the same EBITDA calculation.[8]

17.  In valuing RHC, HHCA anticipated that it could reduce or eliminate

certain RHC expenses.  For example, RHC outsourced its billing and accounting and

employee benefits plans, but HHCA did not.  N.T. 5/22/06 at 16-17, 39-40.  The salary

paid to RHC's chief executive officer would be eliminated after the sale as duplicative.

N.T. 5/22/06 at 40.  HHCA also anticipated reducing RHC's cost of providing home

healthcare services: "[W]e believed that under our management we could improve upon

that in a couple ways, with better utilization of their full-time care givers, which would

generate more visits being done by full-time fixed staff and fewer visits done by a

variable staff . . . ."  N.T. 5/22/06 at 17.

18.  Based upon HHCA'a analysis of RHC's financial records, personnel,

and referral sources, given RHC's location and minimal overlap with HHCA's own home

healthcare operations, and also anticipating improved efficiencies in operating RHC's

business, HHCA negotiated the APA in November 2003 with the intention of closing the

_____

[8]As will be discussed, in December 2003 events at MCP caused Mr. Geller to be
concerned about the agreed-upon purchase price.  At Mr. Geller's direction, Mr. Brunner
prepared a proforma analyzing a value for RHC based upon an EBITDA multiplier of 3.63,
assuming the imminent closure of MCP and its cessation as a patient referral source to RHC, and
assuming MCP constituted 15% of all referrals and then 25% of all referrals.  Ex. D-14.  This
exhibit was offered in support of HHCA's contention that the closure of MCP materially affected
the revenues of RHC and reduced its census.

As will be later addressed, the evidence does not reflect that MCP's impending
closure had an adverse effect upon RHC's overall referrals.  (MCP referrals began to decline
prior to the announced closure and other referral sources increased so that overall referrals
remained fairly constant.)  Not explained at trial, though, are the reasons that this HHCA
proforma includes a higher annualized net revenue projection for RHC than is disclosed in
MHR's attachment to the APA, see also Ex. D-13, a higher EBITDA, and a lower EBITDA
multiplier.

sale before December 25, 2003.  JPS, ¶ 6; N.T. 5/18/06 at 222.  However, HHCA did not

wish to close during the Christmas and New Year's holiday season.  JPS, ¶ 7; N.T.

5/18/06 at 222.  During December 2003, HHCA realized that the closing could not occur

prior to the Christmas season, and it decided to target January 5, 2004—the first business

day after the holiday season—for the RHC asset sale to conclude.  N.T. 5/18/06 at 222.

19.  On December 31, 2003, the parties amended the APA.  JPS, ¶ 8; see

Ex. D-2.  This amendment, sought by HHCA, reduced the cash payment due at closing to

$1,000,000 and increased the amount due 180 days after to $850,000.  Id.  HHCA sought

a change in the payment terms so that it could withhold more of the purchase price if the

announced closing of MCP Hospital proved to have a long-term effect on RHC's home

healthcare business.  N.T. 5/18/06 at 225-26.

20.  On January 21, 2004, the parties further amended the APA.  JPS ¶ 9;

see Ex. D-3.  This amendment altered certain provisions of the agreement to allow the

closing to occur that day.  See Ex. D-3 (recitals); JPS, ¶ 13.  The closing had been delayed

from January 5, 2004 because MHR had not prepared all of the documentation necessary

to complete the closing.  JPS, ¶ 11.

21.  The Second Amendment to the APA included a statement that:

> Seller acknowledges and agrees that, in consideration of
> Buyer's willingness to complete the Closing on January 21,
> 2004, notwithstanding that certain conditions to its obligations
> to do so have not been satisfied or waived, Buyer shall retain
> all of its rights and remedies under the Agreement, including
> hereunder, notwithstanding its determination to effect the
> Closing on January 21, 2004, and that such determination is
> not intended, nor shall be construed, to constitute a waiver,
> whether express or implied, of any such right or remedy of
> Buyer.

10

Ex. D-3, ¶ 4.  Paragraph 2 of the Second Amendment postponed certain documentary

obligations of MHR until after the closing.  During the trial, HHCA offered no testimony

that on January 21, 2004 it knew of any other obligations of the seller that had not been

satisfied.  However, as will be discussed, HHCA did have concerns about the patient

census.

22.  At the January 21st closing, HHCA paid the $1,000,000 installment

(less the $100,000 down payment).  JPS, ¶¶ 13, 31.  The remaining $850,000 installment

was due on or before July 19, 2004, and has not been paid.  JPS, ¶¶ 14, 15.

23. At the closing, Mr. Feldman certified that MHR had complied with all

of the representations, warranties, covenants and conditions in the Agreement.  JPS, ¶ 12.

He signed an Officers' Certificate, ex. D-4, which stated, in part:

> In accordance with Paragraph 7.1 of the Asset Purchase
> Agreement . . . the undersigned President of MHR, hereby
> certifies to HHCA for and on behalf of MHR that:
>
> 1. all representations and warranties of MHR are true and
> correct when made and remain true and correct on the date set
> forth below ("Closing Date") with the same force and effect
> as though made on and as of the Closing Date.

24.  Paragraph 7.1 of the APA concerns conditions precedent to the buyer's

obligations to complete the closing.  See Ex. D-1.  To the extent that HHCA alleges that

MHR did not comply with all conditions precedent, HHCA nonetheless elected to

proceed with the closing.  Thus, since January 21, 2004, it has owned and operated

MHR's home healthcare business.

25.  HHCA has refused to tender its remaining payment under the APA,

contending that RHC was not worth the $1.85 million purchase price.  Specifically, only

about 103 patients were transferred to HHCA in January 2004, Ex. P-49, rather than the

11

200 or more patients that HHCA anticipated.  N.T. 5/18/06 at 237.  On April 20, 2004, HHCA sent to MHR a letter asserting that the latter violated or breached the following paragraphs of the APA: ¶¶ 4.5, 4.6, 4.12, 4.24, 6.1, 6.2, 7.1, 7.2, 11.1 and 11.6.  Ex. D-19.

26.  In mid-December 2003, probably December 17th, N.T. 5/25/06 at 89, HHCA management held a meeting with RHC staff to review the anticipated transition of ownership and control to HHCA in January 2004.  JPS, ¶ 46.  RHC and HHCA had different Medicare provider numbers and provider agreements.  HHCA determined that it either would not or could not simply purchase all of RHC's assets, including assumption of RHC's Medicare provider agreement, and assume operation of RHC's home healthcare business while retaining all of RHC's patients.  See N.T. 5/15/06 at 44-45.  HHCA decided that all of RHC's patients had to be discharged from RHC and informed of the option to be readmitted as an HHCA patient.[9]  RHC staff were so informed and, in accordance with HHCA's directive, patient discharges began forthwith.  N.T. 5/25/06, at 73, 88.

27.  Once RHC discharged a patient, the patient's physician would be involved in any decision to be readmitted to HHCA or any other home healthcare provider.  N.T. 5/25/06 at 49.  After RHC began discharging all of its patients, it is possible that some doctors elected not to refer their patients to HHCA.

28.  In order to avoid employee vacation issues around the holiday season, HHCA decided that its transition to ownership of the RHC business would begin on December 17, 2003 and end on January 5, 2004, the day after all MHR employees would

---

[9]It is not clear why non-Medicare patients needed to be discharged also, if the impetus was solely the different Medicare provider agreements.

12

be terminated by RHC and rehired by HHCA.  JPS, ¶ 50; N.T. 5/15/06 at 43, 47-48.  The

transition of RHC to HHCA's control was completed on January 5, 2004.  N.T. 5/22/06 at

85.

29.  Three possible patient outcomes were identified by HHCA as a result

of the discharge of all RHC patients beginning on or about December 17, 2003: (1)

patients did not need or no longer qualified for continued care, and thus would be

discharged by RHC without any further care; (2) patients needed and qualified for

continued care, and would be admitted to HHCA after discharge from RHC; or (3) the

patient needed and qualified for continued care, but would elect a home healthcare

provider other than HHCA, or choose not to receive further care.  JPS, ¶ 47.

30.  On December 1, 2003, RHC had 231 patients.  JPS, ¶ 49.  On

December 15, 2003, it had 226 patients.  Ex. P-49.  On January 5, 2004, HHCA had 103

patients obtained from RHC during the transition.  Id.  There were 27 new patients

admitted to HHCA via RHC during this period.  Id.  Thus, there were 150 RHC patients

that were discharged after December 15, 2003, and did not need further home healthcare,

or needed it but elected to be treated by a provider other than HHCA, or needed further

care but did not obtain it from any provider.[10]

---

[10]The parties made a commendable attempt to agree to certain patient census data
prior to trial in the form of stipulated facts.  Some of the stipulations are easily reconcilable with
the exhibits introduced at trial and some less so.

JPS ¶ 48 reflects patient discharges in December 2003 and January 2004.  The
parties stipulated that MHR (acting through RHC) discharged 228 patients in December 2003
and 39 in January 2004.  Among those patients discharged by RHC in December 2003, 149 were
discharged as needing no further treatment; 59 patients were to receive further treatment by other
home healthcare providers, hospitals, or skilled nursing facilities; 18 patients refused further
treatment or were not open to further treatment.  Id.

They also stipulated that MHR had 231 patients at the beginning of December

(continued...)

31.  Because HHCA did not accept Aetna health insurance, nine RHC patients covered by Aetna in December 2003 could not be transferred to HHCA.  N.T. 5/15/06 at 49-50.

32.  Also during the RHC ownership transition, telephone calls to RHC were routed to HHCA so that HHCA would directly receive new patient referrals.  N.T. 5/15/06 at 75, 89; N.T. 5/18/06 at 40.  As a result, 115 patients were referred to HHCA as of January 12, 2004.  Ex. P-38.[11]

33.  During the first 11 months of calendar year 2003, RHC's average initial monthly patient census exceeded 200.  JPS, ¶ 49.  HHCA engaged many former RHC employees on the assumption that, beginning in January 2004, it would service roughly

_____

[10](...continued)
2003 and 71 patients at the end of that month.  JPS, ¶ 49. The testimony at trial made clear that around December 17, 2003, RHC began the process of discharging all of its patients and not admitting any new ones.  New patient referrals went to HHCA.  Thus, RHC's low ending census for December 2003 in JPS ¶ 49 would be consistent with this evidence.  Presumably, it had begun but not concluded the discharge process for all of its patients.  Less clear though is how RHC could cease operating on January 5, 2004, have 71 patients on December 31, 2003, and only discharge 39 patients in January 2004.

The parties also stipulated that 93 patients were "transferred or referred to HHCA at that time according to HHCA's records."  JPS, ¶ 51.  The phrase "at that time" may refer to January 4, 2004, since that date is mentioned in JPS ¶ 50.  However, the total of 93 consists of 41 patients "referred to HHCA prior to transition" and 52 patients "discharged and transferred to HHCA."  JPS, ¶51.  There was no evidence that RHC referred any of its patients to HHCA prior to the mid-December transition process.  And it is unclear precisely how and when the 52 patients were transferred to HHCA.

Therefore, since Exhibit P-49 was admitted in evidence, and since part of HHCA's defense in this proceeding involves the census when it assumed control of RHC's business in early January 2004, I have referred to the figures in that trial exhibit.  See also N.T. 5/22/06 at 97 (Mr. Geller stated: "What I know is, the census was 226 on December 15th and the day that we took over that company it was 103.").

[11]Exhibit P-38 states that it is a record of HHCA referrals from January 1, 1980 until January 12, 2004.  As Mr. Brunner testified that this document "actually relates to the referrals to the Roxborough branch in early January 2004," N.T. 5/22/06 at 33, it is likely that this exhibit concerns referrals between January 1, 2004 and January 12, 2004.

the same number of patients on census as RHC had previously averaged.  N.T. 5/18/06 at 237.[12]

34.   RHC employed both full-time, salaried staff and per diem employees. N.T. 5/25/06 at 40-41.  Prior to the sale to HHCA, RHC operated with the policy that if its census decreased in a particular month, RHC reduced the home healthcare patient assignments of per diem employees.  Id., at 41, 77.

35.   As a result of having more staff than needed in January and February 2004, HHCA operated RHC at a loss during those months.  N.T. 5/15/06 at 59; N.T. 5/18/06 at 238.  In the first six months of 2004, HHCA had net revenue of $1,363,000 from its new Roxborough Homecare Division, for an average monthly revenue of $227,167.  Ex. P-93.  This is about $45,000 less in monthly net revenues than RHC averaged in 2003.

36.   To ameliorate the unanticipated lower census, in March 2004 HHCA transferred some patients from its King of Prussia branch to the new Roxborough branch. N.T. 5/22/06 at 20-21.  The King of Prussia branch was "pretty – tightly staffed and we

---

[12]Ms. Lamarra, who oversaw RHC's home healthcare operations, N.T. 5/25/06 at 33-34, testified that she foresaw that the census would drop significantly due to the transition, and that she communicated this observation to Ms. Ellen Pine, who at that time was an executive director of HHCA and involved in the asset purchase.  N.T. 5/25/06 at 22-23, 73-77.  Ms. Pine was involved with the December 17th meeting at which RHC staff, including Ms. Lamarra, were informed about the need to discharge all patients.  Id., at 27.  Ms. Lamarra stated that she voiced this census decline concern to Ms. Pine after the meeting.  Id., at 73-74, 83-84.  Ms. Pine denied hearing that concern from Ms. Lamarra, and had no similar concern herself.  Id., at 92-93.  As there was no corroborative evidence, I do not find it more likely than not that HHCA was made aware of Ms. Lamarra's expectation prior to closing.  However, as will be discussed later, there was no evidence to demonstrate that the census decline was not actually connected to RHC's discharge of all of its patients.

determined that it would make sense since they . . . overlapped territories to transfer some of the patients to balance out the workload." Id. at 20.

37. HHCA was aware as of the January 21st closing that the number of RHC patients transferring over to it "were significantly less than had been expected, but didn't know the full number . . . [or] the full extent of the problem." N.T. 5/18/06 at 229; see also N.T. 5/22/06 at 107.

38. Although HHCA knew on January 21, 2004 that its patient census for its Roxborough division was less than anticipated, it concluded that refusing to complete the sale transaction with MHR was not a viable option because RHC had discharged all of its patients and its staff were employed by HHCA; thus HHCA's patients could not be transferred back to RHC without unwinding the entire transition. N.T. 5/18/06 at 231. In addition, HHCA decided against postponing the closing, because "we pride ourselves at HHCA on being reasonable people and fair people, and we had a contract in place, they had finally complied with the closing conditions and gotten all of the documents that they said that they needed. We had already gotten a concession from them on the payment terms . . . . So we had a reputational risk . . . in the community . . . and I felt that the potential negative publicity and negative [e]ffect on our reputations of not closing when we had a contract in place . . . was . . . a worse problem than not closing, period." N.T. 5/18/06 at 232-33.

39. HHCA, through Mr. Geller, believed that even with the lower starting census than anticipated, RHC was worth at least $1 million to HHCA. N.T. 5/22/06 at 105-06. Furthermore, HHCA anticipated that, if circumstances warranted, it could refuse to pay the balance of the purchase price, thus minimizing its risk. N.T. 5/18/06 at 226;

16

see also N.T. 5/15/06 at 108.  HHCA believed that its reservation of rights contained in

the second amendment to the APA permitted renegotiation of the purchase price after

closing.  N.T. 5/18/06 at 226.

     40.  HHCA bargained for the adverse change warranty in paragraph 4.6 of

the APA to protect itself from negative changes to RHC's business between the time of

signing the APA until closing.  N.T. 5/18/06 at 216-17.

     41.  HHCA suggested at trial that the lower than anticipated number of

patients it obtained after assuming control of RHC on January 5, 2004 was due to three

factors.  First, RHC had a 5.9% error rate in admitting or continuing to treat Medicare

patients, although this was not a "major part" of the problem.  N.T. 5/18/06 at 228.[13]

Second, the patient census "was artificially propped up through the month of December

[2003] by . . . discharges being delayed."  Id.  And, third, the referrals in November and

December 2003 "were dramatically lower than they had been historically."  Id., at 228-29.

The decline in referrals was the "main driver" for the decline in the census on January 5,

2004.  Id., at 234.

     42.  After it closed on the sale of RHC, and concerned about the low census

of patients, HHCA hired IMA Consulting to review MHR's medicare patient records for

2003.  JPS, ¶¶ 53, 54.  "The parties agree[d] that [RHC's] error rate related to Medicare

patient certification for home health services during the period of January through

November 2003 as it related to 'medical necessity' was 5.9 percent . . . ."  Ex. J-1, ¶ 5.

By contrast, HHCA contends that its error rate was "zero or next to zero" because of its

---

[13]Although Mr. Geller testified that there was a 5.9% error rate in "referrals," that
error rate actually concerned treatment of Medicare patients.

17

effective quality assurance program.  N.T. 5/18/06 at 219-20.  The parties stipulated that the national error rate on this issue is 1%.  Ex. J-1, ¶ 4.

43. There are no exhibits that disclose the percentage of RHC patients on Medicare throughout the entire year of 2003.  However, the following exhibits allow an inference to be made.  Exhibits P-12 and P-31 disclose that 31% of patient referrals from June 2003 through August 2003 were Medicare patients, while 33% were Medicare patients in the three months beginning April 1st and ending June 2003.  The September and October 2003 referral logs, Ex. P-32, reveal that 30% of September's referrals and 29% of October's referrals were Medicare patients.  Exhibit P-34 reports that 33% of referrals from October 1st through December 18, 2003 were Medicare patients.  And Exhibit D-8 discloses that 36% of referrals were Medicare-insured in the "last quarter of 2003," which, because RHC's fiscal year ended in June, would refer to the months of April through June 2003.  Since referrals are the main source of patients, it is likely that approximately one-third of RHC's patients in 2003 were Medicare patients.  See also Ex. D-18 (reflecting 33% of referrals were Medicare patients from "October - December 19, 2003").

44.  Medicare patients contributed a larger share of revenue to RHC than other patients.  An attachment to the APA provided by MHR reflects that in the first nine months of 2003, Medicare patients contributed 61% of net revenue.  Ex. D-1, Schedule 4.5.  HHCA seems to have anticipated that Medicare would generate about 57% of net revenue.  Ex. D-14.

45.  If RHC had transferred 200 patients to HHCA on January 5, 2004, as the latter anticipated, a 5.9% Medicare patient error rate would overstate the "true" census

by only 4 patients, given that roughly 33% of the patients were receiving Medicare reimbursement.  Furthermore, assuming average monthly net revenues of $272,000, and further assuming that a 5.9% error rate would overstate monthly Medicare net revenues by the same percentage,[14] then if 61% of net revenues were attributable to Medicare patients, RHC's monthly net revenues would have included less than $10,000 (or about 3.5%) subject to potential reimbursement by Medicare.  Thus, Mr. Geller's statement at trial—that RHC's Medicare error rate was not a significant factor in causing HHCA's lower than anticipated census in January 2004, and lower than anticipated net revenues in early 2004—is correct.

46.   RHC employed Mr. Kevin Massino as assistant director, and among his duties were responsibility for Medicare compliance issues.  N.T. 5/25/06 at 34-36, 57. Mr. Massino began with RHC in January 2003 and left sometime in November or December 2003.  Id., at 57-59, 81.[15]

47.   MHR offered testimony that from November 2002—when Ms. Lamarra was director of RHC—until the January 5, 2004 transition to HHCA control, that no claims were denied by Medicare due to medical necessity or homebound status in 2003.  Id., at 35, 38.  HHCA offered no evidence to the contrary.

---

[14]This assumption was made by Mr. Steven D. Garber, HHCA's damage expert. MHR challenges this assumption, arguing that Medicare reimburses home healthcare agencies at different rates for different types of treatment, and that the bulk of the errors made by RHC may have occurred for patients with less remunerative types of treatment.  See MHR's Post-trial Memorandum, at 26-30.

[15]Ms. Lamarra testified that Mr. Massino was laid off, N.T. 5/25/06 at 57-59, 86, but later explained that HHCA already had a person who performed Mr. Massino's responsibilities, so there would not be a place for him at HHCA.  Id. at 81, 86.

48. RHC was subject to Pennsylvania state surveys. Id. at 34-35. There were no state surveys conducted during Ms. Lamarra's tenure at RHC, but the previous survey a year before had not found any deficiencies in Medicare guidelines. Id. at 36. A mock survey was performed at RHC in the summer of 2003 to prepare for the Joint Commission of Accreditation of Home Health Organizations. Id. at 35, 37. No problems were reported to Ms. Lamarra involving medical necessity or homebound status as a result of this mock survey. Id. at 38.

49. In the course of conducting its due diligence, HHCA became aware that there were some issues concerning the need of some RHC patients for home health services. Ex. P-9. It concluded, however, that those issues were "not material to the . . . transaction, or material to the business." N.T. 5/15/06 at 64; see also N.T. 5/22/06 at 52.

50. RHC's Operating Statement for January through September 2003, attached to the APA, includes a bad debt reserve reflecting approximately 5% of the total budget. Ex. D-1 (Schedule 4.5). HHCA's bad debt reserve was approximately 1.8%. N.T. 5/22/06 at 85. In its proforma assessment of RHC for valuation purposes, HHCA included a 5% bad debt reserve when computing RHC's EBITDA. Exs. D-14; P-17.

51. Virtually all of RHC's patients in 2003 had some form of insurance coverage to reimburse RHC for its services. Between December 2002 and June 2003, "commercial" and "private pay" patient receipts were only 2.7% of total receipts. Ex. D-8. Thus, it is unlikely that RHC's 5% bad debt reserve was established in anticipation that receivables only from uninsured patients would be uncollectable. It is likely that this reserve was established in the event that insurers were to conclude that the services

rendered by RHC were not reimbursable.  Medicare accounted for about 60% of RHC's

receivables.  Ex. D-1, Schedule 4.5.[16]

52.  It is more likely than not that RHC's quality control efforts and

Medicare error rate were consistent throughout 2003, and that RHC did not realize that

this rate was significantly higher than the industry average.  HHCA likely was unaware of

the precise error rate for RHC at the time of the sale, but was likely aware from its due

diligence that RHC's Medicare compliance rate was not as high as HHCA's, see also

N.T. 5/18/06 at 23-24 (RHC's recertification rate for patients was higher than HHCA's),

and viewed this difference either as not materially affecting the value of RHC's business

or already reflected in the purchase offer of $1.85 million.

53.  Although HHCA contends that the December 2003 RHC census was

inflated, it conceded that the December 15, 2003 census of 226 patients was accurate.

N.T.  5/15/06 at 100; N.T. 5/18/06 at 234.  That is, there actually were 226 RHC home

care patients, as RHC's records reflected.

54.  Furthermore, HHCA was unable to identify any particular patients who

were kept on the census too long, despite engaging experts to analyze patient records for

support for this proposition.  N.T. 5/18/06 at 53-54; N.T. 5/22/06 at 121.  All of the

patient discharges appeared to have been appropriate.  N.T. 5/15/06 at 101.

55. HHCA's contention that RHC employees kept their patients on census

too long because referrals were slowing and the employees wanted to keep busy and be

---

[16]See also Ex. D-5 (MHR's own liquidation analysis for all of its operations,
including RHC, and reflecting a potential Medicare recoupment) and Ex. P-92 (HHCA's analysis
of RHC's financial statements through September 30, 2003, which apportions $99,000 of the 5%
debt reserve to Medicare revenues).

rehired by HHCA, N.T. 5/22/06 at 99-102, is a "theory" based on the result that only 103

RHC patients transferred to HHCA on January 5, 2004. Id., at 101, 103; see also N.T.

5/18/06 at 55 (describing this belief as a "gut" feeling).  The defendant offered no data

demonstrating a change in RHC discharge rates during the last quarter of 2003 prior to

HHCA's mid-December directive that all patients had to be discharged as part of the sale

process.  See 5/22/06 at 103.  As HHCA's CEO acknowledged at trial: "If one could find

[discharge] patterns like that, possibly one could prove my theory.  But, one could very

possibly not prove my theory."  Id., at 103.[17]

56.  The parties stipulated that in the home healthcare industry, "[r]eferral

sources for patients are critical to the ability to generate future revenue."  JPS, ¶ 63.  As

---

[17]In its post-trial memoranda, HHCA relies upon JPS ¶ 48 to support its
contention that an unusually high number of RHC patients were discharged in December 2003
and January 2004 as needing no further treatment.  For example, it argues:

> Specifically, paragraph 48 of Exhibit J-2 summarizes the actual
> discharges of MHR's patients between December 2003 and
> January 2004. During this time, 167 out of 267 total patients were
> discharged to the community as having their goals met and
> requiring no further care. It is this disproportionate amount of
> patients being discharged and as requiring no further care coupled
> with the fact that the referral base was dwindling after September
> 2003, that resulted in the change in the census.

Defendant's Post-Trial Reply Memorandum, at 16.
        As noted earlier, this fact stipulation states that 149 out of 228 patients were so
discharged in December 2003 and 18 out of 39 patients were so discharged in January 2004.
However, no similar data from other months were offered in evidence, thus precluding any
comparison or conclusion of "disproportionality."
        Moreover, home healthcare treatment episodes are generally brief, averaging
between one and two months.  See Finding # 56.  As will be discussed, RHC averaged more than
200 new patient referrals each month and had an average monthly census of somewhat more than
200 patients.  Thus, one would anticipate extensive patient turnover from month to month.  If so,
then the statistics in JPS ¶ 48 would not be extraordinary.

Medicare patients are typically discharged in a matter of one to two months, see N.T.

5/15/06 at 73-74, referrals are needed to replenish the patient census. Id., at 76.

57.   These referrals principally come from doctors, hospital administrators,

nursing homes, and assisted living facilities upon releasing patients. N.T. 5/15/06 at 77.

Absent any exclusive contracts with a referral source, which neither RHC or HHCA had,

RHC's referral sources were free to refer patients to any home healthcare provider. JPS,

¶¶ 64, 65.

58.   Throughout 2003 RHC did not have a formal marketing program,

overseen by its director, to maintain and increase referrals. N.T. 5/25/06 at 43, 62-64, 67.

59.   The evidence demonstrates that RHC received 216 (or possibly 221)

and 204 referrals during the months of October 2003 and November 2003 respectively.

Exs. P-34, D-18.[18]   Referrals averaged 6.97 per day in October and 6.80 in November. Id.

From December 1st through "midday" on December 19, 2003, there were 132 patient

referrals for a daily average of 6.95. Id.  In April, May and June 2003, there were 651

patient referrals, averaging 217 per month. Ex. P-31.  In September 2003, there were 257

patient referrals (averaging 8.57 per day). Ex. P-32.  Between January 1, 2004 and

January 12, 2004, there were 115 referrals (averaging 9.6 per day). Ex. P-38.[19]  Finally,

from the beginning of September 2003 to the end of November 2003, RHC averaged 71

Medicare referrals per month and in February 2004, HHCA estimated that it would

receive only 40 such referrals. Ex. P-54.

_____

[18]Ex. P-32 states that October 2003 had a total of 221 referrals.

[19]See note 11 supra.

60. Analysis of referrals and the sources of referrals were components of HHCA's due diligence efforts. See Exs. P-7; P-8; P-9, P-12. HHCA analyzed RHC's primary referral sources during due diligence and did not find any significant overlap with its own. N.T. 5/22/06 at 28-29; Ex. P-12. Therefore, HHCA anticipated that acquiring RHC would increase its referral sources. N.T. 5/22/06 at 64.

61. MHR provided HHCA with considerable information regarding its referrals and sources. Early in HHCA's due diligence process, it was given a pie chart disclosing RHC's major referral sources from April 2003 to June 2003. Ex. D-8.[20] This chart revealed that, in that three month time period, seven referral sources were identified as follows: Albert Einstein Medical Center (AEMC) 38%; Medical College of Pennsylvania (MCP) 25%; Roxborough Memorial Hospital (RMH) 20%; physicians 10%; Northeastern Hospital (NEH) 3%; nursing homes 2%; and "other" 2%. Id. See also Ex. P-31. With 651 referrals in that quarter, MCP would have been the source of 163 referrals or an average of 54 per month.

62. Based in part upon the referral information for the quarter ending June 2003, and using an annual net revenue estimate of $3.2 million, plus estimates of operating expenses (including a bad debt reserve that was about 5% of net revenue) totaling $2,778,000 and an EBITDA multiplier ranging from 4.65 to 5.81, HHCA calculated an estimated range of value for RHC of $2 million to $2.5 million—the estimate used in its original August 2003 expression of interest. Ex. P-17.

_____

[20]This chart concerns RHC's "4th Qtr. 2003." Because RHC's fiscal year ended in June 2003, see, e.g., Ex. D-1 (Schedule 4.5 showing cash flows for years ended June 30, 2001 and 2002), the fourth quarter of 2003 for RHC was not the calendar quarter.

63.  For the time period June 1, 2003 to August 31, 2003, only four categories of referral sources were identified by MHR: RMH (called ROX), AEMC (called EMC), Germantown (called GTN) and "other."  Ex. P-6.  Exhibit P-12, which was prepared by HHCA during due diligence, N.T. 5/22/05 at 30-31, identified the 25 doctors who provided the most referrals to RHC.  Those 25 physicians provided 35% of all referrals during this three month period.  These doctors were affiliated with AEMC, RMH, Northeastern, Germantown Hospital, and "other."  MCP is not mentioned.  Id.

64.  HHCA prepared a referral summary for September 2003.  Ex. P-15.  This summary disclosed that 31.1% of referrals that month came from AEMC, 16.7% from MCP, 16.3% from RMH, 10.1% from Sunrise/Other ALF's, 14.4% from doctors, and 11.3% from others.  Id.  With 257 referrals that month, MCP was the source of 43 referrals.

65.  In October 2003, AEMC provided 33% of RHC's referrals, RMH provided 21.7% and MCP only 13.6%.  Ex. P-32.  Of the 221 referrals in October, MCP provided 30.

66.  From November 11, 2003 (before the APA was executed) until December 18, 2003, the nurses at MCP were on strike.  JPS, ¶ 39.  Then, on December 18, 2003, the owner of MCP (and of MHR), Tenet, announced its intention to close MCP.  JPS, ¶ 41.  This hospital was located within two miles of RHC.  N.T. 5/15/06 at 38.

67.  HHCA did not consider the strike likely to have "any effect on the long-term value of [RHC]."  N.T. 5/18/06 at 221-22.  However, HHCA was concerned that, when MCP closed, RHC might lose a significant referral source of patients.  Id., at 223.  Based upon this concern, Mr. Geller telephoned Mr. Feldman seeking information

regarding MCP referrals and the potential impact the hospital's closure might have upon RHC revenue.  JPS, ¶ 42; N.T. 5/18/06 at 223.

68.  After analyzing RHC referral data up through mid-day of December 19, 2003, Mr. Feldman advised on December 19th that in his opinion the loss of MCP as a referral source would not greatly affect the business, as "MCP's referrals were not as big a piece of the mix as [he] had thought, and that there ha[d] been hardly a blip in the total Roxborough Home Care volume since the MCP strike began in mid-November."  JPS, ¶ 43; Ex. D-15.  Mr. Feldman also opined that, given the relative locations of Roxborough Memorial Hospital (RMH) and MCP, given their common Tenet ownership, and given the percentage of doctors who were on the staffs of both hospitals, RMH had "a very high likelihood of picking up the patients who had been going to MCP."  Ex. D-15.  He noted that RMH's "census increased significantly as soon as the MCP nurses went on strike and has continued at that higher level."  Ex. D-15.  Thus, Mr. Feldman was suggesting that the closure of MCP was unlikely to significantly affect RHC referrals because MCP itself was a relatively small referral source, and because RMH would likely obtain additional patients that would otherwise have been admitted to MCP but for its closure, and some of those additional RMH patients could be referred to RHC.

69.  In addition, Mr. Feldman provided HHCA with certain data concerning MCP referrals to RHC to support his opinions.  See Ex. D-15.  He provided to HHCA a breakdown of the referrals received from MCP, RMH, Einstein and "other" sources in October, November, and thru mid-day December 19, 2003.  This data, tabled below, reflects a decline in referrals from MCP prior to any announced future hospital closing.  See id.

26

| Time Period | Number of Referrals from MCP | Percentage of Total | Total Referrals from All Sources |
|---|---|---|---|
| October 2003 | 31 | 14% | 216[21] |
| November 2003 | 9 | 4% | 204 |
| December 1-19 2003 | 9 | 7% | 132 |

70. Additionally, Mr. Feldman's December 19th e-mail data disclosed to HHCA that referrals from RMH constituted 22% of all referrals during that almost-three month period; from AEMC constituted 32% of all referrals; and from "Other" sources constituted 37% of all referrals.  See id.  He also informed HHCA about total referrals for the period from October 1, 2003 until mid-day December 19, 2003.  October had 216 referrals, for a daily rate of 6.96; November had 204 referrals, for a daily rate of 6.80; and part of December 2003 had 132 referrals for a daily rate of 6.95.  See also Ex. P-34.

71.  HHCA offered no evidence at trial that Mr. Feldman's data on December 19th was incorrect, misleading or inaccurate.  Accordingly, prior to closing, HHCA was aware that during the last calendar quarter of 2003—prior to the signing of the APA and prior to its transition and RHC's complete patient discharge—MCP referrals had diminished significantly as a percentage from the second calendar quarter of 2003, and that MCP was not considered a major RHC referral source.  See also N.T. 5/25/06 at 64-65 (MCP was a referral source, but Roxborough and Einstein were the major referral

---

[21]Exhibit P-32 shows 30 referrals from MCP in October 2003, constituting 13.6 percent of a 221 total.  These numbers are not appreciably different from those utilized by Mr. Feldman in his December 19, 2003 e-mail message to HHCA.

sources).  Furthermore, HHCA was informed that other referral sources had increased so that, even with MCP's lower profile, daily referrals remained fairly consistent.  See N.T. 5/22/06 at 122 (these daily averages were "fairly minor fluctuations" in referral patterns).

72.  Despite receipt of this information, HHCA continued at closing to believe that MCP was a major referral source for RHC and viewed it as illogical that MCP's closure would not significantly affect RHC's business.  N.T. 5/18/06 at 224-26. HHCA utilized the events occurring at MCP to negotiate a change in the payment terms in the APA, mentioned above.  Id. at 226.  It tried, but was unsuccessful in negotiating a purchase price for RHC below the $1.85 million in the APA.  Id. at 227.  HHCA continues to believe that RHC's referral stream was significantly slowing prior to the transition.  N.T. 5/15/06 at 105.  However, there was no evidence offered that this occurred.

73.  There were 115 referrals from January 1, 2004 through January 12, 2004, for a daily referral rate of 9.58 patients.  Ex. P-38.  Referral data from November 1, 2003 until February 24, 2004, ex. P-54, shows that there were a total of 174 referrals in December 2003.  Since Exhibits P-34 and D-18 show 132 referrals from December 1 through December 19, 2003, the daily rate of referrals from December 20, 2003 to the end of December was 5.6 (174 total referrals minus the 132 referrals received up until December 19, divided by 11 days), down from 6.95 earlier in the month.  Id.  In January 2004 there were 134 referrals, yielding a daily rate of only 4.32 (or only about 1 per day after January 12th).  Referrals in February 2004 totaled only 94 through February 24th, for a daily rate of 3.92.  Id.  Clearly, the number of monthly referrals declined from October 2003 through February 2004.  But the daily referral rate remained reasonably

28

consistent through December 19, 2003, and only began to decline significantly after RHC

began to discharge its patients during the holiday season, as part of the HHCA-led

transition to new ownership.[22]

74.  As a percentage of patient referrals, MCP as a source constituted 4.4%

in November 2003, 6.3% in December 2003, 8.2% in January 2004 and 3.2% in February

2004.  Id.  The data is tabled as follows:

| Time Period | Number of Referrals from MCP | Percentage of Total | Total Referrals from All Sources |
|---|---|---|---|
| December 2003 (total) | 11 | 6.3% | 174 |
| January 2004 | 11 | 8.2% | 134 |
| February 2004 (thru the 24th) | 3 | 3.2% | 94 |

---

[22]HHCA, relying upon Ex. P-54, emphasizes a downward referral trend from
September 2003 (257) to October 2003 (221) to November 2003 (204) to December 2003 (174)
to January 2004 (134) to February 24, 2004 (94).  I find this analysis unpersuasive for two
reasons.
    First, it includes December 2003, January and February 2004, months in which
HHCA either began its transition (with the discharge of all RHC patients) or assumed complete
control.  As will be discussed, MHR argues that these factors adversely affected the referral rates.
    Second, if one concentrates only on monthly referral rates in 2003 and only when
RHC was operating in its usual manner, besides the months of September through December 19
2003, the only other referral data offered in evidence is found in Ex. P-31, addressing the months
of April through June 2003.  Those three months yielded a total of 651 referrals, for an average
of 217 per month.  (No data was offered in evidence for the months of January through March
200, or July and August 2003.)  The referral averages for the second calendar quarter of 2003 are
consistent with the October and November 2003 referral rates, as well as the December 1st-19th
daily rate, and therefore suggests that September 2003 data was unusually high.
    There was testimony that referral rates can fluctuate.  N.T. 5/18/06 at 55-56; N.T.
5/25/06 at 40-41, 44-45.  If one allows for some monthly fluctuations, the limited evidence of
record suggests that daily referral rates were fairly consistent in 2003 up to December 19, 2003.

75. About one month after closing on the sale, on February 25, 2004, HHCA determined that after its acquisition of RHC the number of Medicare patient referrals declined, primarily from RMH, Chestnut Hill Hospital, doctors, Sunrise ALF and other assisted living facilities. Ex. P-54. MCP is not mentioned in this analysis. Id. Since RHC, upon its sale to HHCA, no longer had a common ownership with RMH, it is possible that RMH and the doctors affiliated with it might have chosen another home healthcare provider to service their patients.

76. HHCA did not communicate with RHC's referral sources prior to closing, intending to communicate with them only after acquisition of RHC. JPS, ¶¶ 67, 68. Neither did HHCA create any written marketing plan directed towards referral sources prior to its acquisition of RHC. JPS, ¶ 66. HHCA anticipated that by retaining the RHC employees responsible for servicing the latter's various referral sources, RHC referrals would remain consistent after the asset sale. N.T. 5/15/06 at 84-85, 114.

77. HHCA offered no evidence that RHC staff acted to lower the referral rate after the transition and sale to HHCA. N.T. 5/15/06 at 103-05.

78. Steven D. Garber was engaged by HHCA as an expert to determine the damages allegedly suffered by HHCA in its purchase of RHC. His initial damage assessment was modified after the parties agreed, just prior to trial, that the evidence established RHC's Medicare error rate at 5.9%. His testimony at trial, N.T. 5/18/06 at 78-79, and his supplemental damage report, Ex. D-20, modified his initial damage report. Ex. D-17. Mr. Garber opined that HHCA was damaged in the amount of $540,000, based upon the stipulated Medicare error rate of 5.95% ($300,000) and the lower than expected

census ($240,000).  MHR challenged Mr. Garber's assumptions, methodology and conclusions.[23]

II.

I reach the following legal conclusions:

1.  The parties' asset purchase agreement is governed by Pennsylvania law.

2. The parties expressly agreed that this bankruptcy court can enter final judgment in this proceeding.

3.  The plaintiff met its evidentiary burden to demonstrate that the defendant breached the asset purchase agreement by failing to pay the balance of the purchase price.

4. The defendant did not meet its evidentiary burden to demonstrate that the plaintiff breached any warranties or representations.

5. To the extent that there were any breaches by the plaintiff of conditions precedent in the contract, such breaches were waived by the defendant's decision to complete the purchase of plaintiff's home healthcare division, and its decision not to seek rescission of the contract.

6. The plaintiff is entitled to pre-judgment interest under Pennsylvania law.

---

[23]Mr. Garber's damage opinion may be inconsistent with Mr. Geller's opinion that RHC's Medicare error rate was a minor part of HHCA's business difficulties with low patient census.

31

III.

MHR alleged in its complaint that HHCA breached the Asset Purchase

Agreement by failing to make the $850,000 post-closing payment.[24]  HHCA generally

averred as affirmative defenses that it is not obligated to pay any additional amount to

MHR as its obligations are excused as a result of MHR's material breach of the

agreement.

The parties' contract, ¶ 13.10 of the APA, provides that enforcement

actions are governed by Pennsylvania law.

_____

[24]It also alleged that HHCA should turn over $850,000 as a debt that is property of
the estate and that is matured, payable on demand, or payable on order, pursuant to 11 U.S.C. §
542.  Courts construing section 542(b) have concluded that for turnover of money from a
defendant:

> the liability must be undisputed.  In re [FLR Co.], Inc., 58 B.R.
> 632, [634] (Bkrtcy. E.D. Pa. 1985) ("Implicit in the bankruptcy
> concept of turnover is the idea that the property being sought is
> clearly the property of the Debtor but not in the Debtor's
> possession.  Turnover, 11 U.S.C. § 542, is not the provision of the
> Code to determine the rights of the parties in legitimate contract
> disputes[.]").  Liability is not undisputed unless there is "a final
> judgment from a court of competent jurisdiction or a stipulation by
> the defendant."  In re Satelco, Inc. v. North American Publishers,
> Inc., 58 B.R. 781, 786 (Bkrtcy. N.D. Tex. 1986).  See also In re
> Theobald Industries, Inc., 53 B.R. 506, 508 (Bkrtcy. D.N.J. 1984)
> ("Since the right to payment of the claims [asserted by the estate] is
> contingent on a judgment establishing liability, the claims are not
> 'matured').

Ches-Mont Utilities Const. Co. v. Willistown Woods Associates, 1992 WL 96335, at *2 (E.D.
Pa. Apr. 24, 1992).  As liability here is disputed, turnover under section 542 is not appropriate.
However, to the extent that MHR asserts a state law breach of contract action, both parties
consented to the entry of a final judgment by me.

Under Pennsylvania law, a plaintiff alleging breach of contract must establish "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (citing Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999)); see also Sampathachar v. Federal Kemper Life Assur. Co., 186 Fed. Appx. 227, 230 (3d Cir. 2006). That is, the plaintiff must prove that it substantially complied with the contract so that the defendant was obligated to perform under the agreement. See, e.g., Otis Elevator Co. v. Flanders Realty Co., 244 Pa. 186, 190 (1914). The burden of persuasion thereafter would shift to the defendant to prove its affirmative defenses. See Evans v. Fegely, 67 Pa. 370 (1871); Iddings v. The Equitable Gas Co., 8 Pa. Super. 244 (1898); see also Girard Bank v. John Hancock Mut. Life Ins. Co., 524 F. Supp. 884, 892-93 (E.D. Pa. 1981) (defendant had burden to prove breach of contractual representations or warranties). Each party must meet its evidentiary burden by a preponderance standard. See, e.g., Ragnar Benson, Inc. v. Bethel Mart Associates, 308 Pa. Super. 405, 413 (1982).

In its complaint, MHR alleged that it and HHCA entered into the Asset Purchase Agreement "pursuant to which MHR agreed to sell and HHCA agreed to purchase substantially all of the operating assets owned by MHR relating to its home healthcare business." Complaint, ¶ 8. It further alleged that HHCA made the closing-day payment of $1,000,000, but not the $850,000 due on July 19, 2004. Complaint, ¶¶ 12-14. HHCA does not dispute that it entered into the APA and did not make the final payment according to the terms of the contract. See Answer, ¶¶ 12, 14; JPS, ¶¶ 8, 14-15. HHCA further does not dispute that MHR did indeed transfer the RHC business assets to

33

HHCA as required, along with the requisite documents, and that it has owned and operated the Roxborough division since January 2004. As a result of HHCA's breach, MHR asserts that it was damaged in the amount of $850,000, plus costs and attorney fees.

Clearly, MHR has proven that it transferred RHC's business to HHCA, as agreed, but the buyer did not comply with the payment terms of the contract. The crux of this litigation, however, is that HHCA disputes that MHR satisfied all of its contractual promises. The defendant contends that there was a massive patient census drop as of January 5, 2004, as well as a decrease in patient referrals, both of which violated the no adverse change provisions of the contract. HHCA's Post-trial Memorandum, at 13. In addition, the defendant contends that MHR breached various warranties because of its 5.9% Medicare patient error rate and its failure to operate the business "diligently" in 2003. Id., at 13, 61.

As to MHR's operational deficiencies beyond its error rate, HHCA maintains that patients were retained on RHC's census too long in December 2003, id., at 57, and that RHC failed to perform adequate marketing. Id., at 61. In addition, HHCA contends that MHR's statement regarding the minimal effect that the closing of MCP Hospital had upon patient referrals was false. Id., at 56.

In its post-trial reply memorandum, HHCA articulates its position that the APA price was too high, given the true state of RHC's business and the events that followed the signing of the agreement; moreover, HHCA argues that MHR agreed to accept the risk of such overpricing. As a result, the defendant asserts that it never received the benefit of its contractual bargain and need not pay the full contract price:

> . . . HHCA submits that the problems in this transaction were
> caused by a number of facts, none of which were the fault of

34

HHCA.  First, the negotiated purchase price was too high given the fact that the warranted Financial Statements were overstated by the Medicare Error Rate.  Second, MHR failed to adequately track and monitor the referral sources and take affirmative steps to correct declines in the referrals.  The problems with the referrals were exacerbated upon the announced closure of MCP which had previously accounted for 25% of RHC's referral base.  At the end of the day, these two general problems manifested themselves in the reduction of the patient census at the Transition.  Simply put, RHC did not have enough patients that continued to need care or qualified for Medicare.

In each instance, the Agreement assigned MHR the risk for these problems.  HHCA is entitled to the benefit of its bargain with regard to these items.

HHCA's Post-Trial Reply Memorandum at 4.

HHCA did not receive the benefit of its bargain:

a. HHCA bargained for the purchase of a business with 5.9% more legitimate Medicare patients than ever actually existed.

b. HHCA bargained for the purchase of a business with a steady census in excess of 200 patients.  HHCA received a business with approximately half of that figure.

c. HHCA bargained for the purchase of a business in which MCP accounted for 25% of the referrals.  Because of the closure of MCP, these referrals never materialized.

The fact that HHCA now owned a business that has a significantly smaller volume does not mean that HHCA obtained the benefit of its bargain.

HHCA's Post-Trial Reply Memorandum at 12.

. . . HHCA submits that the facts show that there was a tremendous decline in the census because RHC did not have enough patients that needed further care and did not generate enough new patients.  Specifically, paragraph 48 of Exhibit J-2 summarizes the actual discharges of MHR's patients

35

> between December 2003 and January 2004.  During this time,
> 167 out of 267 total patients were discharged to the
> community as having their goals met and requiring no further
> care.  It is this disproportionate amount of patients being
> discharged and as requiring no further care coupled with the
> fact that the referral base was dwindling after September
> 2003, that resulted in the change in the census.
>
> Moreover, MHR has not proven that the change in the census
> was caused by the mass discharge.  MHR's own records show
> what happened to the patients.  (Exhibit J-2, paragraph 48).
> For the most part, they didn't need further care.  Ms. Lamarra
> testified that no patients were abandoned by MHR.
> Furthermore, MHR has presented no evidence that any of the
> patients, other than the nine Aetna patients, chose to go to a
> different provider.  In short, the evidence presented does not
> support a conclusion that the change in census of the Business
> was caused by the mass discharge associated with the transfer
> of patients.

HHCA's Post-Trial Reply Memorandum at 16.

In addition to its contention that MHR breached various contractual

provisions, HHCA maintains that such contractual violations were material breaches.  As

a result, HHCA argues that it is entitled to retain ownership of the business assets for the

partial contractual price paid, unless MHR can prove that the value of those assets was

greater than the consideration already received.  The defendant asserts:

> The actual burden of proof in this case is more fully set forth
> in HHCA's main Brief.  Specifically, HHCA has the burden
> of proving that there was a breach in the Agreement.  Once it
> is determined that a breach existed, HHCA then has the
> burden of proving that the breach was material.  If HHCA
> sustains its burden of proving that the breach is material, the
> Plaintiff may only recover based upon a restitution theory of
> damages under Section 374 of the Second Restatement of
> Contracts.  Under such a scenario, the Plaintiff would have
> the burden of proving restitution damages.  If HHCA is not
> successful in proving that there was a material breach, HHCA
> would be entitled to a set-off against MHR's claims.  See
> Sevast v. Kakouras, 841 A.2d 1062 (Pa. Super. 200[3]).

36

HHCA's Post-Trial Reply Memorandum at 19.[25]

MHR does not agree with any of the defendant's contentions. First, it disputes that it violated any contractual terms. As will be discussed, MHR made no express representations or warranties guaranteeing HHCA a minimum patient census, a particular referral rate, or a minimal net income level. Second, it contests HHCA's legal position that if a seller violated a contract which a buyer does not seek to rescind then the seller has the evidentiary burden to demonstrate the value of the property sold to the buyer. Rather, MHR maintains that HHCA has the duty to demonstrate the extent of its damages; and it further complains that the defendant's expert damage evidence was so speculative and unpersuasive that HHCA's burden was not met.

Although the parties spend much effort on their respective evidentiary burdens regarding the value of RHC's business and the strength (or lack thereof) of HHCA's damage evidence, I must first address the issue of MHR's alleged breach of

---

[25]Given my factual and legal conclusions that MHR did not breach the APA, I need not address HHCA's damage contentions. Nonetheless, I feel constrained to note the counter-intuitiveness of defendant's position.

The defendant argues that even if I were to accept the opinion of its own expert (over plaintiff's vociferous objections) that it was damaged in the amount of $540,000, it still would not be liable to the plaintiff in the amount of $310,000— viz. $850,000 unpaid purchase price minus $540,000 in damages. HHCA contends that Pennsylvania law limits its liability at most to the difference between the value of the assets transferred and the amount already paid. And as MHR offered no such valuation evidence, HHCA contends that it gets to keep its purchased assets without any additional payment. Presumably, HHCA's position would be unchanged even if it had paid less than $1 million at closing.

Not only does this contention seem contrary to the traditional common law principle that a party's liability for a contract breach is limited to provable damages, but Lancellotti v. Thomas, 341 Pa. Super. 1 (1985), referred to by HHCA, may not support its position that, under Pennsylvania law, upon a contractual breach by a seller a buyer may retain assets for less than the purchase price and place the burden upon the seller to demonstrate the value of the assets retained. Compare U.S.B. Acquisition Company, Inc. v. Stamm, 660 So. 2d 1075 (Fla. Ct. App. 1995) (buyer of business must demonstrate difference between the value paid and the actual value of the business); Greathouse v. Jones, 158 Colo. 516 (1965) (same).

contract.  That is, HHCA concedes that it must demonstrate that MHR violated certain

provisions of the APA, <u>see</u> HHCA's Post-Trial Reply Memorandum at 19, before it could

be permitted to retain RHC's assets and offset the contract price.  I thus turn to the

question whether MHR breached any contractual provisions.  Only if HHCA proves by a

preponderance of the evidence that MHR violated the APA would it be necessary to

consider the issue of damages and the requisite state law burdens of proof on that

question.

IV.

HHCA raises numerous contractual provisions that it claims were violated

by MHR.  Specifically, it alleged that MHR breached paragraphs 7.1 and 7.2 of the Asset

Purchase Agreement, which provided as follows:

Article VII

CONDITIONS PRECEDENT

TO THE OBLIGATIONS OF BUYER

The obligation of Buyer to complete the Closing is subject to
the satisfaction of the following conditions (any one or more
may be waived in writing by Buyer to the extent permitted by
applicable Law):

7.1. <u>Agreements, Representations and Warranties</u>.  The
representations and warranties of Seller contained in this
Agreement shall have been true and correct when made and
shall be true and correct on and as of the Closing Date with
the same force and effect as though made on and as of the
Closing Date.  Seller shall have performed and complied with
all covenants and agreements required by this Agreement to
be performed or complied with by it on or prior to the Closing
Date.  Seller shall have delivered to Buyer a certificate dated

38

as of the Closing Date and signed by the President of Seller, certifying that (i) all representations and warranties of Seller were true and correct when made and remain true and correct on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date, (ii) all covenants and agreements required to have been performed or complied with by Seller on or prior to the Closing Date have been performed or complied with, and (iii) all conditions to Buyer's obligations to complete the Closing have been satisfied or, to the extent permitted by applicable Law, waived.

7.2. <u>No Adverse Change</u>.  There shall have been no material adverse change in the assets or the Business or the prospects thereof since June 30, 2002.  Without limiting the foregoing, Seller shall not have suffered any Loss to any of the Assets, whether or not insured, or been subject to any adverse action, which would, individually or in the aggregate, affect or impair the ability of Buyer to conduct the Business.

Before attempting to interpret these conditions precedent and then analyze whether MHR has not complied, as the defendant contends, <u>see generally</u> <u>Mellon Bank, N.A. v. Aetna Business Credit, Inc.</u>, 619 F.2d 1001, 1007 (3d Cir. 1980) ("The generally accepted rule is that the burden of proof in regard to a condition precedent is on the party alleging the breach of the conditional promise."),[26] I will consider the enforceability of these conditions in this adversary proceeding.

These two contractual terms raised by HHCA are found in Article VII, titled "Conditions Precedent to the Obligations of the Buyer."  Ex. D-1, at 21.  Therefore, they are clearly intended to be construed as conditions precedent.  <u>See</u> <u>Carter v. Edwin J. Schoettle Co.</u>, 390 Pa. 365 (1957) (contract clearly established the seller's financial status as condition precedent, not as a warranty or representation); <u>see generally</u> <u>Mellon Bank,</u>

---

[26]The same evidentiary burden applies to a party asserting a breach of a condition subsequent.  <u>See</u> <u>Massachusetts Bonding & Ins. Co. v. Johnston & Harder</u>, 340 Pa. 253, 261 (1940).

N.A. v. Aetna Business Credit, Inc., 619 F.2d at 1016 (state law requires conditions

precedent to be "expressed by clear language").  Under Pennsylvania law, "a condition

precedent must occur before performance under a contract arises[.]"  Village Beer and

Beverage, Inc. v. Vernon D. Cox and Co., Inc., 327 Pa. Super. 99, 109 (1984).  Consistent

with this definition, the sales contract stated that "[t]he obligation of Buyer to complete

the Closing is subject to the satisfaction of the following conditions (any one or more of

which may be waived in writing by Buyer to the extent permitted by applicable Law)."

Article VII contained eight separate paragraphs detailing numerous

conditions imposed upon seller MHR.  Paragraphs 7.1 and 7.2, quoted above, were but

two; there were also requirements for Orphans' Court approval, delivery of certain

permits and consents, retention by HHCA of identified RHC employees, and others.

The failure of MHR to comply with these conditions precedent would have

permitted HHCA to refuse to consummate its purchase of RHC.  That is the remedy

specified in the preamble to Article VII of the APA, and it is the traditional contractual

remedy for such non-performance.  See generally Carter v. Edwin J. Schoettle Co., 390

Pa. at 376-77; In re Sugarhouse Realty, Inc., 192 B.R. 355, 378 (E.D. Pa. 1996);  In re

Stroud Ford, Inc., 190 B.R. 785, 787 (Bankr. M.D. Pa. 1995); Restatement (Second)

Contracts, § 224 (2006).  As the District Court of Delaware explained, however, the non-

performance of a condition precedent is not technically a breach of contract entitling the

other party to damages:

> The assertion that the nonperformance of a condition
> precedent constitutes a breach of the agreement is incorrect.
> See 3A Corbin on Contracts § 634, at 33.  See also Saulcy
> Land Co. v. Jones, 983 P.2d. 1200, 1204 n. 2 (Wyo. 1999);
> Frost Constr. Co. v. Lobo, Inc., 951 P.2d 390, 397 (Wyo.
> 1998) ("A condition precedent should not be described as

40

broken."). Rather, a condition merely does not exist or does
not occur. See 3A Corbin on Contracts, § 634.

> The non-fulfillment of a promise is called a breach of
> contract, and creates in the other party a secondary right to
> damages; it is the failure to perform that which was required
> by a legal duty. The non-occurrence of a condition will
> prevent the existence of a duty in the other party; but it may
> not create any remedial rights and duties at all, and it will not
> unless someone has promised that it shall occur.

Weiss v. Northwest Broadcasting Inc., 140 F. Supp. 2d 336, 345-46 (D. Del. 2001); see

also Carter v. Edwin J. Schoettle Co., 390 Pa. at 377; Edwards Business Machines, Inc. v.

Laughlin, 1995 WL 170128, at *3 (E.D. Pa. 1995):

> Similarly, a failure of conditions set forth in an Asset
> Purchase Agreement gives rise to the ability of the purchaser
> to refuse to proceed to closing. However, if instead the
> purchaser proceeds to closing, the condition will be deemed to
> have been waived. As the Third Circuit recently noted, under
> Section 225 of the Restatement (Second) of Contracts, "while
> 'a contracting party's failure to fulfill a condition excuses
> performance by the other party whose performance is so
> conditioned, it is not, without an independent promise to
> perform the condition, a breach of contract subjecting the
> nonfulfilling party to liability for damages[.]'"

(quoting In re Columbia Gas System, Inc., 1995 WL 97407, at *6 (3d Cir. Mar. 10,

1995)).

In this proceeding, the evidence is clear that HHCA elected to complete the

transaction and has retained ownership of RHC. Indeed, years after the closing, it does

not seek to rescind the transaction (and probably could not do so as RHC no longer

operates).

Despite a contractual provision stating that waiver or modification of its

terms must be in writing, Pennsylvania permits a subsequent waiver by conduct or orally.

See, e.g., Universal Builders, Inc. v. Moon Motor Lodge, Inc., 430 Pa. 550, 557 (1968);

41

Brinich v. Jencka, 2000 Pa. Super. 209, 757 A.2d 388, 399 (2000), app. denied, 565 Pa.

634 (2001); Rosenzweig v. Suburban Orthopedics Associates, Ltd., 1988 WL 65905, at

*5 n.2 (E.D. Pa. 1988); see also Prousi v. Cruisers Div. of KCS Int'l., Inc., 975 F. Supp.

768, 771-72 (E.D. Pa. 1997) (condition precedent can be waived by conduct), recon.

granted on other grounds, 1999 WL 551359 (E.D. Pa. 1999).[27]  By electing to perform

under the contract, and by declining to return the property purchased even after learning

of the alleged breach, HHCA has chosen to waive any non-compliance of those

conditions precedent that were included in the APA.  See Edwards Business Machines,

Inc. v. Laughlin, 1995 WL 170128, at *3; see also Greenleaf v. Safeway Trails, Inc., 140

F.2d 889, 891 (2d Cir. 1944) ("If the audit can be considered as a condition precedent to

executing the note, the condition was waived both by the statement of account (exhibit 7)

and by continuing to accept the benefits of the contract of October 22, 1940."); cf.

Watson v. Miller, 164 Ore. App. 309 (1999) (a party can waive a contractual condition by

accepting performance, thus triggering a duty on that party to perform as well).

 HHCA argues nonetheless, see Defendant's Post-Trial Memorandum, at 55

n.19, that the second amendment to the APA contained a non-waiver provision and thus

MHR's duty to fulfill those conditions precedent remains outstanding.

 Paragraph 4 of Amendment No. 2, Ex. D-3, provides in relevant part:

> Seller acknowledges and agrees that, in consideration of
> Buyer's willingness to complete the Closing on January 21,
> 2004, notwithstanding that certain conditions to its obligations
> to do so have not been satisfied or waived, Buyer shall retain

---

[27]Indeed, as will be discussed below, there was a non-written waiver of a
contractual provision insisted upon by HHCA.  Although RHC promised to operate its business
as it normally did, until closing, HHCA required that RHC discharge all of its patients prior to
closing.

> all of its rights and remedies under the Agreement, including
> hereunder, notwithstanding its determination to effect the
> Closing on January 21, 2004, and that such determination is
> not intended, nor shall be construed, to constitute a waiver,
> whether express or implied, of any such right or remedy of
> Buyer.

I find unpersuasive HHCA's assertion that this provision permits it to raise in this adversary proceeding MHR's failure to comply with any condition precedent in the APA. Any "right and remedy" for a seller's breach of a condition precedent would be limited to the buyer's right to decline to purchase, see Carter v. Edwin J. Schoettle Co., 390 Pa. at 378-79, a result neither feasible at this time nor desired by HHCA. Accordingly, I conclude that even if MHR failed to comply with the provisions of ¶¶7.1 or 7.2, such a failure of a condition precedent would not entitle HHCA to reduce the contract price while retaining RHC's assets and business. See Carter v. Edwin J. Schoettle Co. ("The parties carefully and scrupulously delineated between the sellers' undertakings which were intended to be 'warranties' and those which were intended to be 'conditions.' It is crystal clear that the undertaking under paragraph 9(a) was simply a 'condition' and not a 'warranty' and once the buyer elected to accept this agreement the provisions of paragraph 9(a) ceased to be operative and the buyer had no right to recover any damages."); Weiss v. Northwest Broadcasting Inc., 140 F. Supp. 2d at 346; see also Edwards Business Machines, Inc. v. Laughlin, at *4.

V.

In addition to the conditions precedent in the APA, HHCA also contends

that MHR breached certain "representations and warranties[28] of seller," adversely

affecting the value of the business it purchased.  It emphasizes, inter alia, RHC's

---

[28]There is a distinction between contractual representations and warranties.  A contractual warranty is "[a]n express or implied promise that something in furtherance of the contract is guaranteed by one of the contracting parties; esp., a seller's promise that the thing being sold is as represented or promised."  Black's Law Dictionary (8th ed. 2004).  A contractual representation is "[a] presentation of fact – either by words or by conduct – made to induce someone to act, esp. to enter into a contract."  Id.

The difference between the two has been described as follows:

A warranty differs from a representation in four principal ways: (1) a warranty is an essential part of a contract, while a representation is usu[ally] only a collateral inducement, (2) an express warranty is usu[ally] written on the face of the contract, while a representation may be written or oral, (3) a warranty is conclusively presumed to be material, while the burden is on the party claiming breach to show that a representation is material, and (4) a warranty must be strictly complied with, while substantial truth is the only requirement for a representation.

Id.; see also Karp v. Fidelity-Phenix Fire Ins. Co., 134 Pa. Super. 514, 517-18 (1939):

The difference between a warranty and representation is well stated in Miller v. National Casualty Co., 62 Pa. Super. 417, 420, as follows: "A warranty must be literally true, without regard to its materiality to the risk, while a representation must be true only so far as it is material to the risk."

As will be seen, HHCA appears to treat all 24 provisions of APA Article IV as warranties and none as simply representations.

Medicare error rate, the drop in the patient census in January 2004, the decline in referrals

from MCP, and the alleged failure of RHC personnel to undertake marketing efforts.[29]

In analyzing the APA (and its amendments), I note that the contract states

that Pennsylvania law shall govern, see, e.g., APA ¶ 13.10, and also provides that

"[a]mbiguities and uncertainties in the wording of the Agreement shall not be construed

for or against any Party, but shall be construed in the manner that most accurately reflects

the Parties' intent as of the date of this Agreement." Ex. D-1, ¶ 13.11. Indeed,

Pennsylvania law directs that "[a] fundamental rule in construing a contract is to ascertain

and give effect to the intent of the contracting parties." Mace v. Atlantic Refining

Marketing Corp., 567 Pa. 71, 80 (2001); accord Chen v. Chen, 586 Pa. 297, 893 A.2d 87,

93 (2006). A contractual provision is generally interpreted "to have the most reasonable

and beneficial operation that its language permits." Reilly v. City Deposit Bank & Trust

Co., 322 Pa. 577, 582 (1936).


A.


HHCA asserts (on page 63 of its post-trial memorandum) that MHR

breached paragraphs 4.3 and 4.8 of Article IV, Representations and Warranties of Seller,

which provide as follows:

---

[29]In April 2004, HHCA sent to MHR a notice of the latter's breach of the APA. Ex. D-19. In it, HHCA asserts numerous breaches of the APA, including fraud, some of which are not addressed in its post-trial submissions. I shall assume that, based upon discovery and the evidence adduced at trial, HHCA has now concluded that not all of its assertions made in April 2004 were proven, or even true, and will only address the issues raised post-trial by the defendant.

Seller hereby represents and warrants to Buyer on and as of the Agreement Date and on and as of the Closing Date as follows: . . .

4.3.   No Breach.  Except as set forth on Schedule 4.3, the consummation of the transactions herein contemplated including the execution, delivery, performance and consummation of this Agreement and the Documents required to effect the transactions herein contemplated, do not and shall not (a) constitute a violation of or default under (either immediately or upon notice, lapse of time or both), conflict with or result in a breach of . . . (iv) any Laws; or . . . (c) result in the breach of any of the terms and conditions of, constitute a default under or otherwise cause any impairment of, any Contract, or Permit[.][30] . . .

4.8   Compliance with Laws.  Seller's operations in connection with the Business and the Assets, Seller's conduct of the Business as and where such Business is presently or has in the past been conducted, and the Assets and their uses comply with all applicable Laws. . . .

HHCA contends that these two contract provisions were violated by RHC having a Medicare error rate of 5.9%.  HHCA further maintains that even if it knew or should have known of the seller's error rate, because of its due diligence, paragraph 10.1

---

[30]"Law" is defined in the APA as "any provision of any law, statute, ordinance, order, constitution, charter, treaty, code, rule or regulation enacted, approved or adopted by any Governmental Agency and applicable common law."
"Contract" is defined as "any written or oral contract, agreement, instrument, commitment or binding arrangement, express or implied, of any nature whatsoever."
"Permit" is defined as "any license, permit, approval, certificate, Consent, right or privilege of any kind or nature whatsoever granted, issued, approved or allowed by any Governmental Agency."

of the APA renders the buyer's knowledge irrelevant for purposes of enforcing certain

representations and warranties.[31]

_____

[31]Paragraph 10.1 of the APA states:

Notwithstanding any right of Buyer to fully investigate the affairs
of Seller and notwithstanding any knowledge of facts determined
or determinable by Buyer pursuant to such investigation or right of
investigation, Buyer has the right to rely fully upon the
representations, warranties, covenants and agreements contained in
this Agreement or in any Document delivered to Buyer or in any
statement to Buyer made by representatives of Seller in connection
with the transactions contemplated by this Agreement.  Each
warranty, representation and covenant contained herein is
independent of all other warranties, representations and covenants
herein (whether or not covering identical or related subject matter)
and must be independently and separately complied with and
satisfied.  All representations and warranties shall survive the
Closing for a period of two (2) years following the Closing, except
that the representations and warranties set forth in Sections 4.2,
4.8, 4.13, 4.14, 4.18, 4.20, and 4.22 shall each survive until ninety
(90) days after the expiration of the applicable statutory period of
limitation with respect to any claims arising out of, relating to or
caused by any misrepresentation, breach or failure of any such
representation or warranty.  All covenants and agreements shall
survive the Closing in accordance with their respective terms.
Notwithstanding any provision hereof to the contrary, all
representations, warranties, covenants and agreements that are the
subject of one or more claims for indemnification pursuant to
Article XI, notice of which claims has been delivered in
accordance with this Agreement during the survival period set
forth above, shall survive the Closing until all such claims have
been finally settled or finally adjudicated by a court of competent
jurisdiction.

In Giuffrida v. American Family Brands, Inc., 1998 WL 196402, at *4-*5 (E.D.
Pa. 1998), the district court predicted that the Pennsylvania Supreme Court would allow a party
to a contract to enforce a warranty, even if the party did not rely upon the warranty, at least when
the contract expressly provides that the warranty would be preserved.  The parties have not cited
and I am unaware of any reported Pennsylvania state court decision that has either agreed or
disagreed with the prediction of Giuffrida.  While I will accept arguendo its thoughtful analysis
that a party's warranty may not be eliminated by the due diligence of the other contracting party,
a distinction relevant to this proceeding should be noted.  In construing the parties's intended

(continued...)

Clearly, ¶ 4.3, in which MHR warrants the lack of certain effects of the sale transaction, is not implicated by the seller's Medicare error rate. Although not identified expressly by HHCA in its post-trial memorandum (or in its April 2004 notice of breach letter to MHR), its memorandum reference to paragraph 4.3 of APA is probably unintended. On page 63, it refers to a contract provision providing that MHR represented and warranted that it had no "'Knowledge' of any circumstances that would call into question the medical necessity of any services which are the basis of any claim . . . ." That provision is found in paragraph 4.13 of the APA, not 4.3. Thus, I will consider whether the evidence demonstrates that MHR violated ¶ 4.13.

The representation and warranty in ¶ 4.13 is titled "Third-Party Payment Filings." Ex. D-1. It was designed to address issues of payment from the Medicare and Medicaid program, and is one of a number of provisions intended to insulate HHCA from any liability to those governmental programs for services provided by RHC prior to selling the business to HHCA. Paragraph 4.13 states:

> Third Party Payment Filings. Seller has filed on a
> timely basis all claims, cost reports and annual
> filings required to be filed by it to secure payment under
> Medicare and Medicaid programs for the Business. Seller has
> no Knowledge of any circumstances which would call into
> question the medical necessity which are the basis for any
> claim, and all services provided by Seller in the Business have
> been provided pursuant to valid physician orders. Seller is not
> subject to Medicaid program audits for the Business except as
> set forth on Schedule 4.13, and to the extent required by
> applicable Law, Seller has filed all Medicare cost reports and
> has received settlements for all amounts billed Medicare

---

[31](...continued)
scope of their warranties, their joint prior knowledge can be relevant. That is, unless the contractual language is very clear, it is unlikely that a contract would intentionally contain a warranty that both parties know, or are likely to know, cannot be true.

Business.  The liability for amounts due Medicare reflected on
Seller's latest balance sheet included in the Financial
Statements is adequate to cover all amounts due from Seller to
Medicare for the Business.  All claims, cost reports or annual
filings made by Seller to secure payment under the Medicare
and Medicaid programs for the Business are complete and
correct except to the extent that the Medicare and Medicaid
programs have issued to Seller prior to the Closing Date
notices of program reimbursements making adjustments
thereto.  Seller has no liability to Medicaid by reason of
services provided prior to and including the closing date for
the Business.

I assume that HHCA intended to argue in its post-trial memorandum that
RHC's Medicare error rate in 2003 runs afoul of this provision.  I also disagree with
defendant's contention that this provision was breached.

Paragraph 4.13 consists of seven sentences addressing RHC's pre-sale
filings with Medicare and Medicaid concerning payments and overpayments.  To the
extent HHCA views them as seven discrete warranties, it focuses only upon the second
sentence as allegedly breached: "Seller has no Knowledge of any circumstances which
would call into question the medical necessity which are the basis for any claim, and all
services provided by Seller in the Business have been provided pursuant to valid
physician orders."

The term "Knowledge" is defined in the APA as: "[W]ith respect to any
Person, that (a) such Person is actually aware of a particular fact or other matter or (b) a
prudent Person could be expected to discover or otherwise become aware of a particular
fact or other matter in the course of conducting a reasonably comprehensive investigation
concerning the existence of such fact or other matter."  Ex. D-1, ¶ 1.1.

The evidence at trial reflects that RHC did not know that its Medicare error
rate was higher than the national average, and believed it had a quality control person in

49

place to alert it to repayment problems.  The evidence further revealed that RHC's error

rate had not surfaced in any real or mock audit prior to the sale, see generally Chaves

County Home Health Service, Inc. v. Sullivan, 931 F.2d 914 (D.C. Cir. 1991), and that

HHCA, while discovering during due diligence that RHC had some quality control issues,

did not discover the extent of the problem until long after the sale closing, and only after

it hired an expert to analyze carefully chosen samples of RHC's 2003 patient records.

See Ex. D-16.  A sample is used because it is too time-consuming and expensive to look

at every patient file, given patient turnover during a calendar year.

       The evidence also revealed that MHR established a bad debt reserve in part

to address any potential Medicare overpayments, and that HHCA was aware of this bad

debt reserve.  Moreover, on average every home healthcare agency has some Medicare

error rate.

       Given the evidence that all home healthcare agencies are likely to have

some Medicare error rate, one cannot conclude that the parties intended that MHR was

warranting in ¶ 4.13 that it had none or that HHCA was misled into believing that it had

none.  Nor does the evidence reflect that RHC hid the true state of affairs from HHCA, or

that RHC should have known that its error rate exceeded the national average.

       Furthermore, RHC also represented in paragraph 4.13 that its "[l]iability for

amounts due to Medicare reflected on Seller's latest balance sheet included in the

Financial Statements is adequate to cover all amounts due from Seller to Medicare for the

Business."  HHCA, which bargained to exclude any liability for Medicare and Medicaid

overpayments made to RHC, does not argue that this provision has been violated by

MHR.  There was no evidence that Medicare or Medicaid sought recoupment of any

overpayments from RHC or HHCA.  See generally Reliable Home Health Care, Inc. v. Thompson, 2002 WL 22025 (E.D. La. 2002) (explaining that Medicare makes interim payments on an estimated basis and audits those payments at a later time for under- or overpayment).  Plus, RHC established a debt reserve which would protect against this contingency.

Therefore, HHCA has not met its burden of demonstrating that MHR breached APA ¶ 4.13 concerning "third-party payment filings."

B.

I reach a similar conclusion concerning paragraph 4.8, which warrants and represents that MHR conducted its business operations in compliance with relevant laws. This provision was not violated simply because RHC appears to have improperly provided services in 2003 to a small fraction of its patients, and in so doing may not have been entitled to reimbursement from Medicare for treating those patients.

I appreciate that 42 CFR § 484.55 provides that one condition a home health agency should follow to participate in the Medicare program is a "comprehensive assessment" of its Medicare patients.  Further, the "HHA must verify the patient's eligibility for the Medicare home health benefit including homebound status, both at the time of the initial assessment visit and at the time of the comprehensive assessment."  Id.

The evidence demonstrated that RHC complied with this regulation, but during 2003 for 5.9% of its Medicare patients its assessments may have not met some treatment standard or other condition imposed by Medicare for repayment.  See generally

51

Reliable Home Health Care, Inc. v. Thompson.  Given HHCA's concession that it too

may have a small number of Medicare patients for which it may not be entitled to

reimbursement, given that HHCA bargained that it would not be held liable under the

APA for any Medicare overpayments received by RHC, given the lack of evidence that

Medicare has sought recovery of any overpayments from RHC, and given the parties'

stipulation that there is a national average Medicare error rate for home health care

providers, I conclude that it was unlikely that the parties intended in November 2003 that

a general provision concerning RHC's compliance with laws would serve as a warranty

that RHC had absolutely no Medicare error rate.[32]

Thus, I conclude that RHC was operating in compliance with federal, state

and local laws as intended by the parties when they signed the APA.

HHCA also contends that the existence of RHC's Medicare error rate

violated ¶ 4.5 of the APA.  See Defendant's Proposed Legal Conclusions, ¶ 7(c);

Defendant's Post-Trial Reply Brief at 11.  Paragraph 4.5 states:

Financial Statements: Corporate Records and Reports

(a) Seller's fiscal year ends on June 30.  Schedule 4.5 contains
the financial statements and notes thereto of seller (including
balance sheets and related statements of operations, changes
in net assets and cash flows (at and for the fiscal year ended
June 30, 2002, 2001 and 2000).  All such statements including
footnotes thereto were audited and reported upon by Smart &
Associates, LLP, Certified Public Accountants, and an
unqualified auditor's opinion with an explanatory paragraph.
Schedule 4.5 also sets forth the seller's financial statements
for the Business (including unaudited balance sheets and
related statements of operations, changes in net assets and
cash flows) at and for the nine (9) months ended September

---

[32]The logic of HHCA's argument would mean that RHC would violate ¶¶ 4.8 and
4.13 if it had any Medicare error rate at all, even one less than the national average.

30, 2003.  The foregoing financial statements of seller are
hereinafter collectively referred to as the "Financial
Statements".  The Financial Statements are true and correct
and fairly present the financial position of the Business as at
such dates, and the results of its operations and the changes in
its net assets and its financial position for the periods then
ended in accordance with GAAP, except that the monthly
payroll accruals are not recorded, the amount of which would
not be material.  The Financial Statements do not contain any
misstatements or omissions regarding the Business.  The
Financial Statements are not affected by transactions or
accounts with affiliated persons, if any, other than as set forth
in Schedule 4.5.

(b) Seller's books and records relating to the Business are and
have been properly prepared and maintained in form and
substance, and accurately reflect all of the respective items of
income and expenses, and all of its respective assets and
Liabilities, and accruals adequate for preparing Financial
Statements in accordance with GAAP except that monthly
payroll accruals are not recorded, the amount of which would
not be material.  Seller has filed all reports required by all
laws to be filed, and has duly paid or accrued on its respective
books on account all applicable duties and charges due or
assessed against or pursuant to such reports.

Ex. D-1, ¶ 4.5.

Essentially, HHCA argues that MHR's financial statements were not "true

and correct" and did not "fairly present [RHC's] financial position" because the Medicare

revenues were overstated by virtue of the 5.9% error rate.  Again, my review of these

statements and the evidence at trial finds the defendant's position unpersuasive.

The revenues that MHR disclosed were accurately stated and actually

received.  There is no evidence that RHC did not receive the amount of revenue noted on

its financial statements.  Further, MHR budgeted for a potential Medicare overpayment in

its bad debt reserve—an overpayment which the governmental agency has not sought or

asserted.[33]  Once again, HHCA is arguing in effect that MHR warranted in ¶ 4.5 that RHC

had no Medicare error rate whether known to RHC or not.  It is unlikely, for the reasons

previously stated concerning ¶¶ 4.8 and 4.13, that the parties so intended.

C.

On page 64 of its post-trial memorandum, HHCA maintains that MHR

violated ¶ 4.24 of the APA.  This paragraph provided:

> 4.24   Full Disclosure.  The information furnished by or on
> behalf of Seller to Buyer in connection with this Agreement
> and the transactions contemplated hereby does not contain any
> untrue statement of material fact and does not fail to state any
> material fact necessary to make the statements made, in the
> context in which they are made, not false or misleading.
> There is no fact which Seller has not disclosed to Buyer in
> writing which adversely affects, or so far as Seller can now
> foresee, shall adversely affect, the Assets, the Business or
> condition (financial or other) of Seller or any of them or the
> ability of Seller to perform this Agreement.

HHCA asserts that this provision was breached in the following numerous

ways:

> 1. The referrals for the business began dropping after
> September, 2003;
>
> 2. 5.9% of RHC's Medicare patients did not qualify for
> Medicare;
>
> 3. RHC's director failed to perform the marketing function of
> her job;

---

[33]I am unaware of any governmental overpayment claim having been filed in this
bankruptcy case.

     4. RHC failed to adequately maintain a Medicare compliance program;

     5. RHC terminated a key employee, Mr. Massino, without written notice to HHCA as required by the Agreement;

     6. RHC's census dropped prior to closing; and

     7. RHC failed to disclose the adverse impact of the announced closure of MCP.

Id.

     Furthermore, HHCA argues that Mr. Feldman's December 2003 e-mail messages to HHCA, opining that MCP's intended hospital closure would have a minimal effect upon RHC's business, were untrue and are also within the scope of the representation and warranty of ¶ 4.24.  Id.

     Other than this reference to December 2003 e-mails and its contentions about the Medicare error rate, HHCA does not maintain that any of the information provided by MHR during due diligence was erroneous or falsified.  From the evidence presented, it appears that RHC earned the amounts disclosed in its financial reports, had the number and categories of patients that were disclosed to HHCA, and had the patient referrals that it disclosed and from the sources that were disclosed.

     It is true that RHC's director, Ms. Lamarra, was not involved with marketing efforts.  But MHR never represented otherwise.  Obviously, RHC must have undertaken some marketing efforts, for its business over a number of years was successful enough to attract expressions of interest from more than one prospective buyer.  And if, as HHCA now asserts, RHC's marketing efforts should have been more extensive, its net income might have been higher and the purchase price would have been greater.  Thus,

Ms. Lamarra's lack of marketing involvement was not a material fact hidden from HHCA, which MHR had a duty to reveal under ¶ 4.24.

It is also true that RHC had a higher than national average Medicare error rate in 2003, but the seller never implied nor represented otherwise to HHCA. RHC had an employee, Mr. Massino, among whose duties was to review patient records for Medicare compliance. His employment was terminated in November or December 2003 when it became clear that his services would not be needed by HHCA. See Finding #46 n.12. There was no evidence offered that HHCA was unaware of this—indeed, since it hired RHC staff in early January 2004, it must have known who was no longer employed by RHC—or that MHR sought to hide his termination. Thus, his termination as part of the transition to HHCA ownership was not a material fact that fell within the scope of ¶ 4.24 of the APA.[34]

Insofar as MHR's disclosures regarding patient census and patient referrals are concerned, HHCA has not pointed to any information provided to it that was not true, including RHC's December 2003 e-mail messages, noting the decline in MCP referrals from June 2003 levels. HHCA conceded at trial that the patient census information was accurate, as was the referral information. Indeed, as mentioned in the fact finding section, the limited evidentiary record reflects that the daily referral rate was fairly constant throughout 2003, until the commencement of the transition period when HHCA assumed control of RHC's operations. See Findings ## 59, 73.

---

[34]Paragraph 7.8 of the APA contains, as a condition precedent, that certain key employees of MHR would agree to become employed by HHCA upon the sale of RHC. Schedule 7.8 identifies these three employees, and Mr. Massino is not among them.

56

The evidence admitted in this proceeding does not reflect that MHR was a seller who falsified financial information to deceive HHCA, compare Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 358 (3rd Cir. 2002), nor does it involve a seller who promised some minimum level of future revenue to a buyer.  There was no evidence that the seller attempted to or successfully siphoned business from the buyer, or hid crucial facts about the business from the buyer.

Having reviewed the testimony, documents and arguments of the parties, I conclude that defendant HHCA has not proven by a preponderance of the evidence that seller MHR did not fully and accurately disclose its business, assets and financial condition as of the time the agreement of sale was signed, and even up to closing, as the parties intended when the APA was signed in November 2003.

IV.

HHCA's closing arguments and post-trial submissions make it clear that its central affirmative defense involves paragraph 4.6 of the APA: the "no adverse change" provision of the contract.

Article IV of the APA, Ex. D-1 at 11, states that the:

Seller hereby represents and warrants to Buyer on and as of the Agreement Date and on and as of the Closing Date as follows: . . .

4.6    No Adverse Change.  From and after December 31, 2002, the business, activities and operations of Seller relating to the Business have been carried on and conducted in the ordinary course of business, diligently and in the same manner as they have been conducted in the past, and there has not been and there shall not be an adverse change in the Assets or

57

Business or prospects of Seller relating to the Business.  Any
change which has occurred reflects only the ordinary and
regular conduct of the Business or the normal use or operation
of the Assets.  Seller has no Knowledge of any such
impending change, and since December 31, 2002, there has
not been any damage, destruction or loss affecting the Assets
or the Business, whether or not covered by insurance.

This clause contains several promises by the seller MHR: to carry on RHC's

business in the ordinary course; to carry on the business diligently; to warrant that there

was and will not be an adverse change in the assets, business or prospects of seller; and to

represent that seller has no knowledge of any impending change.  Notably, the clause

protects the buyer against adverse changes; however, it does not protect a buyer against a

change occurring in the "ordinary and regular conduct of the Business or the normal use

or operation of the Assets."[35]

As I read HHCA's post-trial submissions, it does not argue that there was

any damage, destruction or loss affecting the "assets" of RHC, a term distinct in ¶ 4.6

from the term "business."  Nor does HHCA address expressly that provision of ¶ 4.6

excluding from its scope those changes which occurred due to the ordinary and regular

conduct by RHC of its home healthcare business.

Instead, HHCA contends that a "striking drop in referrals after September

2003" constitutes an "adverse change" in the business or its prospects.  Defendant's Post-

_____

[35]The term "Business" is defined as the "home health care business conducted by
the Seller and the Properties used in such business."  APA, Ex. D-1 at ¶ 1.1.  "Property" is
defined to mean "real, personal, or mixed property."  Id.  And "Assets" are described as
including scheduled: tangible property, inventory, contract rights, intangible property, customer
lists, claims and causes of action.  Id., at ¶¶ 1.1, 2.1.  The assets do not include the sellers'
Medicare provider number or agreement, its accounts receivable, or patient medical records.  Id.,
at ¶¶ 1.1, 2.2.

Trial Memorandum, at 55.  On that issue, it emphasizes a decline in the referral stream

from MCP, which it argues was a "major referral source" formerly "account[ing] for 25%

of RHC's referrals."  Id., at 56.

   In addition, HHCA also maintains that the drop in patient census between

December 2003 and January 2004 constitutes an adverse change in the business.  Id.  It

contends that this decline arose from an unusual number of patients discharged in

December 2003 and January 2004 as having completed their treatment: the result of

"RHC . . . keeping its patients on census too long."  Id., at 57.  The defendant also

complains that the Medicare error rate of 5.9% resulted in an inflated census of patients.

Id., at 58.  Furthermore, HHCA maintains that, based upon historic RHC patient data, it

"had reasonable expectations that the census on closing would approximate 200 patients."

Id.

   In considering the evidence, as well as the parties' intent and language of

the adverse change clause, I cannot agree with HHCA that MHR breached the

representation and warranty found in ¶ 4.6 of the APA.

   The purpose behind a broad material adverse change ("MAC") provision in

an asset purchase agreement was described by one court as follows: "[T]hat provision is

best read as a backstop protecting the acquiror from the occurrence of unknown events

that substantially threaten the overall earnings potential of the target in a durationally-

significant manner.  A short-term hiccup in earnings should not suffice; rather the

Material Adverse Effect should be material when viewed from the longer-term

perspective of a reasonable acquiror."  In re IBP, Inc. Shareholders Litigation, 789 A.2d

14, 68 (Del. Ch. 2001) (footnote omitted).  Compare KLRA, Inc. v. Long, 6 Ark. App.

125 (1982) (a 48% drop in radio station profits from contract signing to closing was a

material adverse change) with Borders v. KLRB, Inc., 727 S.W.2d 357, 359 (Ct. App.

Tex. 1987) (Arbitron ratings showing loss of one-half of the audience of a radio station

between signing of sale agreement and closing was not a material adverse change because

the MAC clause was intended by the parties to prevent "deliberate adverse action" by

seller's management).

A commentator recently offered this conceptual approach to MACs:

> From a theoretical perspective, MAC clauses represent a mechanism to alleviate the "lemon problem"—the problem faced by a better-informed seller trying to convince a less-informed buyer that the object of the sale has no hidden defects. Left unallayed, the buyer's doubts will lead to a steep discount in the offered price, perhaps even reducing it below the seller's minimum sale price and scuppering a potentially valuable deal.
>
> By agreeing to bear the cost of any unwelcome post-signing development, the seller can induce the buyer to apply a shallower discount and raise the offer price. MAC clauses are a means of arranging such a cost-shift. Should a material adverse change materialize, the deal will be broken off or renegotiated; in either case, the erstwhile seller will be forced to swallow the costs of coping with the adverse change.
>
> This perspective provides a framework for the interpretation of MAC clauses in court, in cases where the parties' language is not unambiguous. Two principles, in particular, are useful as background for this paper's consideration of courts' actual practice. First, courts should avoid interpreting an event as a material adverse change if its occurrence—or the strong probability of its occurrence—was expected by the buyer or was obvious, or if the buyer had as much information on the risk as the seller. The impact of such an event should already be reflected in the agreed price; granting the buyer an option to break off the deal would be a reallocation of value contrary to what the parties originally bargained for. For example, if a software maintenance company suffers a decline in sales of 70% in the second quarter of 2000, as its Y2K contracts end, the decrease in revenue ought not be considered a material

> adverse change—it was surely foreseen by the acquiror and
> accounted for in the offer price.
>
> Second, courts' view of materiality ought to depend on the
> needs and purposes of the buyer, as it is the buyer's doubts
> and fears that the MAC is intended to allay.  For instance, if
> an acquiror is interested in a small biotech company solely for
> the sake of a patent it holds, a sudden plummeting of the
> company's sales should not be material.  While the plummet
> is clearly material to the company as a going concern, it does
> not impact the purposes of the acquiror in making the deal.
> The revelation of a third-party claim of prior art, on the other
> hand, might well be considered material.

Galil, <u>MAC Clauses In A Materially Adversely Changed Economy</u>, 2002 Colum. Bus. L.

Rev. 846, 849 (2002).

I appreciate that ¶ 4.6 does not use the modifier "material" in addressing the

absence of adverse changes.  But I also note that HHCA explained that its intent in

bargaining for this contract provision was similar to a MAC: to protect itself from

negative changes to RHC's business between the time of signing the APA until closing.

N.T. 5/18/06 at 216-17.  The buyer's intent is relevant in construing contractual terms.

<u>See</u> Galil, <u>MAC Clauses In A Materially Adversely Changed Economy</u>, 2002 Colum.

Bus. L. Rev. at 853.

I now consider HHCA's specific contentions regarding ¶ 4.6.

HHCA cites to <u>In re Eastern Continuous Forms, Inc.</u>, 302 B.R. 320 (Bankr.

E.D. Pa. 2003), <u>aff'd</u> 2004 WL 2418285 (E.D. Pa. 2004).  In that decision, the bankruptcy

court held, and the district court agreed, that the failure of a seller to disclose to its

business purchaser information known to the seller about the financial difficulties and

likely ownership transfer of its major customer—a customer historically responsible for

28% of the seller's revenues—violated a contractual provision covering material adverse

changes to "business operations or prospects," when shortly after the business sale the customer ceased dealing with the buyer and the buyer's business became bankrupt.  Id. at 302 B.R. 330-31; 2004 WL 2418285, at *3.

HHCA likens the reduction of referrals made to RHC by MCP as analogous to the loss of a major customer in Eastern Continuous Forms, and argues that the referral loss represented an adverse change in RHC's business or prospects, within the scope of ¶ 4.6.

The evidence does demonstrate that the number of referrals coming from MCP declined in 2003.  In April thru June 2003, RHC averaged 54 referrals per month from MCP.  See Finding # 61.  In September, this number dropped to 43, then to 31 in October, 9 in November, and 11 in December 2002.  See Findings ## 64, 69, 74.  In January 2004, HHCA received 11 referrals from MCP, and in February 2004, just 3.  See Finding # 74.

HHCA's contention, though, that MCP provided 25% of all RHC referrals prior to the sale is thus misleading.  It did in the first half of 2003; however, MCP did not provide one-quarter of RHC's referrals in the second half of 2003 when the sale agreement was signed.  Moreover, HHCA knew or should have known this when it was negotiating the APA through its due diligence and analysis of RHC's referral logs.  See, e.g., Exs. P-6, P-12, P-15, P-32.  Indeed when Mr. Brunner of HHCA was analyzing, in February 2004, the decline in Medicare patient referrals after the sale closed, the decline in MCP referrals is smaller than the decline from other referral sources.  Ex. P-54.

Unlike Eastern Continuous Forms, in this adversary proceeding the evidence shows that there was no sudden cessation of business from a major RHC referral

source either between the time the APA was signed and closing, or immediately after

closing.  Nor was any information known to MHR that was hidden from HHCA.  The

MCP hospital closing was publicly announced, and MHR provided HHCA with accurate

referral information.  Moreover, the evidence also reflects that as MCP referrals declined

in 2003, which decline pre-dated its announced closing, patient referrals from other

sources increased, and the net number of daily referrals remained fairly constant.  See Ex.

P-34.  This is another significant distinction from the facts of Eastern Continuous Forms

and demonstrates that the reduction in referrals from MCP was not adverse to RHC's

business or its prospects.

Therefore, I conclude MHR was not in breach of paragraph 4.6 of the APA

because MCP reduced its patient referrals after June 2003.[36]

The evidence does reflect that after HHCA took control of RHC's home

healthcare business, the number of patients and patient referrals significantly declined.

And such declines were, indeed, adverse changes in the home healthcare business or its

prospects; however, the APA did not impose the risk of those two declines upon MHR.

Paragraph 4.6 required RHC to conduct its business as it had in the past.  It

also excluded changes arising from RHC's normal operations of its business.  The

evidence demonstrates that RHC conducted its home healthcare business consistently

until December 17, 2003.  Whatever operational flaws that HHCA now complains

---

[36]While citing to Eastern Continuous Forms as factually analogous, HHCA
ignores that court's damage analysis.  The court held that the damages allowed to the buyer
would be limited to provable lost profits solely due to the cessation of business from the major
customer.  Id., 302 B.R. at 341-43.  When the loss of one customer is replaced by another, as
occurred here, so that net revenues for RHC in 2003 were fairly constant, such a methodology
yields no damages.

about—i.e., lack of marketing and quality control—existed and persisted throughout

2003.  And after studying RHC's operations, HHCA reached a value of the worth of the

business.  RHC's daily referral rate, quarterly net revenues and methods of conducting

business were fairly consistent throughout 2003.

After December 17, 2003, RHC's method of operating changed

significantly.  All patient referrals were channeled to HHCA.  It began to discharge all of

its patients.  And it terminated all of its employees.  These changes were all made at the

insistence of HHCA, the intended purchaser, prior to closing, because the defendant had a

different Medicare provider number than did RHC and HHCA wanted all patients under

its own provider number.  And the evidence suggests that all of the "adverse changes" in

referrals and patient census occurred after December 17th.

There was no evidence offered whether HHCA could have assumed RHC's

Medicare provider agreement as part of the asset purchase if the buyer so desired.  See

United States v. Vernon Home Health, Inc., 21 F.3d 693 (5th Cir. 1994) (provider

agreement was assigned).  But the non-assumption of the provider agreement lessened

HHCA's potential liability for any possible Medicare overpayments made to RHC.  See

id.[37]

MHR argues that HHCA itself is responsible for the loss of census and

referrals.  The plaintiff complains of the defendant's lack of marketing after the APA was

signed and prior to closing.  See generally In re JC's East, Inc., 1995 WL 555765, at *3

---

[37]Indeed, Mr. Feldman testified that, prior to his involvment with MHR, he
participated in the sale of Visiting Nurse Service System (VNSS) and the buyer of VNSS
assumed the seller's provider number.  Moreover, he was unaware of any significant census
decline occurring in that transaction.  N.T. 5/25/06 at 158-59.

(S.D.N.Y. 1995) (seller of restaurant did not violate "mac" provision when two employees left after the sale because "the need to retain key employees . . . was something which [the buyer] could have anticipated and done something about.").  It also asserts that HHCA had a poor reputation in the home healthcare industry, thus causing doctors and referral sources to consider other providers for their patients, including former RHC patients.  And it notes that HHCA was not affiliated with any hospital—RHC had a Tenet affiliation— and so, without exclusive referral agreements, could not reasonably expect Tenet physicians to continue referrals at the same level.  MHR even speculates that patients and physicians may have been annoyed or confused by RHC's mass patient dismissal.

I need not decide whether any or all of MHR's proffered explanations and speculations for the post-transition decline in census and referrals to HHCA are accurate. The burden fell upon HHCA to demonstrate that it was more probable than not that the declines did not stem from its decisions and instructions to RHC, but from RHC's non-ordinary or irregular conduct.  And it failed to do so.

HHCA contends that RHC employees kept patients on its census longer than was normal in December 2003 to inflate the census and induce HHCA to hire them. If so, this would be an adverse change.  However, as discussed in the fact findings, the evidence does not support this theory.  It does not refute it either.  The evidence is simply insufficient to reach the conclusion asserted.

HHCA also argues that patient referrals declined in the last calendar quarter of 2003.  However, the evidence reflects a fairly consistent daily referral rate except for month of September.  See Exs. P-34; P-54.  Instead, the evidence makes it at least as

65

likely that the declines in referrals and census, of which HHCA now complains, arose due

to HHCA's transition to ownership or after its ownership.  Indeed, the preponderance of

the evidence shows significant declines in patient referrals after December 19, 2003 when

HHCA was either directing RHC's actions or operating the business.  See Finding # 73.

And MHR did not warrant that its existing referral sources would continue to refer

business to HHCA after the purchase at the same levels as pre-purchase.  See generally

Pittsburgh Coke & Chemical Co. v. Bollo, 421 F. Supp. 908, 930 (E.D.N.Y. 1976) (post-

sale decision of vendors to cancel contracts dissolved expectations of the buyer but did

not constitute seller's breach of warranty).

        HHCA argues as though it simply purchased a turn-key home healthcare

business with the same RHC employees performing the same patient functions.  Thus, it

reasons, the patient census and referrals should have been unaffected by an ownership

change.  Since they were not, the cause must be an inflated RHC census, a decline in

RHC referrals, some significant operational flaw by RHC, or some combination thereof.

This argument, however, overlooks that HHCA controlled RHC for more than one month

prior to closing.  This event probably was not anticipated when the APA was signed, and

occurred because HHCA decided that such pre-ownership control was in its interests.

And the evidence discloses it is more likely than not that the adverse changes of which

HHCA complains begin around the time of this ownership transition period.

        HHCA could have sought warranties from MHR regarding minimum

census figures at closing, or minimal referral rates at closing, or even minimal net revenue

figures.  It did not.  It could have assumed RHC's provider agreement and eliminated any

transition period prior to ownership.  It elected not to.  Instead, it sought to insulate itself

66

from any potential overpayment liability while making certain assumptions that RHC's business revenues would be unchanged by such efforts. These assumptions proved, at least in the short term, to be inaccurate.[38] Nonetheless, HHCA did not prove that the result was caused by adverse changes within the intended scope of ¶ 4.6 of the APA.

VI.

Having determined that HHCA did not prove by a preponderance of the evidence that MHR breached various warranties in the APA, I need not delve into the parties' complicated analysis of the defendant's damage evidence; nor need I resolve their difference over Pennsylvania law and the burden of persuasion. MHR is entitled to judgment for the unpaid portion of the contract purchase price: $850,000. There are, however, two issues that remain.

A.

First, in its post-trial memorandum, at 5, MHR demands pre-judgment interest from HHCA, computed from the date the final payment under the APA was due: 180 days from the January 21, 2004 closing (viz. July 19, 2004). See Ex. D-1, ¶ 2.5(c); Ex. D-2; JPS, ¶ 14.

---

[38]The parties did not offer evidence regarding census, referrals or net revenues of HHCA beyond a few months after closing. Ex. P-93.

Pennsylvania permits prejudgment interest to be awarded for breach of

contract litigation.  See Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh, 776

F.2d 1174, 1178 (3d Cir. 1985).  As early as 1955, the Pennsylvania Supreme Court

concluded that the payment of prejudgment interest in contract actions was a component

of common law in that state:

> Plaintiffs were entitled to interest at the rate of 6% per annum
> from the time when they should have been paid for the
> services rendered by them.  In all cases of contract interest is
> allowable at the legal rate from the time payment is withheld
> after it has become the duty of the debtor to make such
> payment; allowance of such interest does not depend upon
> discretion but is a legal right. . . .  It is a right which arises
> upon breach or discontinuance of the contract provided the
> damages are then ascertainable by computation and even
> though a bona fide dispute exists as to the amount of the
> indebtedness.

Palmgreen v. Palmer's Garage, Inc., 383 Pa. 105, 108 (1955) (citations omitted).

This entitlement follows acceptance by Pennsylvania courts of the

provisions of the Restatement of Contracts § 337, later Restatement (Second) of Contracts

§ 354 (1979).  See, e.g., Penneys v. Pennsylvania R. Co., 408 Pa. 276, 280 (1962);

Somerset Community Hosp. v. Allan B. Mitchell & Associates, Inc., 454 Pa. Super. 188,

202 (1996).

One state appellate court explained the nature of prejudgment interest in

less mandatory terms:

> It is well established that in contract cases, prejudgment
> interest is awardable as of right. . . .  Our courts have
> generally regarded the award of prejudgment interest as not
> only a legal right, but also as an equitable remedy awarded to
> an injured party at the discretion of the trial court.  Daset Min.
> Corp. v. Industrial Fuels Corp., 326 Pa. Super. 14, 473 A.2d
> 584 (1984).  "In claims that arise out of a contractual right,

> interest has been allowed at the legal rate from the date that payment was <u>wrongfully</u> withheld, where the damages are liquidated and certain, and the interest is readily ascertainable through computation." <u>Id.</u> at 35, 473 A.2d at 595 (emphasis added).  The basic premise underlying the award of prejudgment interest to a party centers upon the fact that the breaching party has deprived the injured party of using interest accrued on money which was rightfully due and owing to the injured party.

<u>Somerset Community Hosp. v. Allan B. Mitchell & Associates, Inc.</u>, 454 Pa. Super. at 201; <u>accord</u> <u>Fortney v. Tennekoon</u>, 1998 WL 159047, at *15 (E.D. Pa. 1998); <u>see</u> <u>also</u> <u>In re Blatstein</u>, 260 B.R. 698, 721-22 (E.D. Pa. 2001).  Prejudgment interest accrues at the legal rate, which in Pennsylvania is 6%, simple interest.  <u>See</u> 41 P.S. § 202; <u>Fortney v. Tennekoon</u>, 1998 WL 159047, at *15.

Some state court decisions have left it unclear whether prejudgment interest under Pennsylvania common law for breach of contract is mandatory or discretionary  For example, in <u>Melley v. Pioneer Bank, N.A.</u>, 834 A.2d 1191, 1204 (Pa. Super. 2003), the Pennsylvania Superior Court stated: "Our courts have generally regarded the award of prejudgment interest as not only a legal right, but also as an equitable remedy awarded to an injured party at the discretion of the trial court." (quoting <u>Kaiser v. Old Republic Ins. Co.</u>, 741 A.2d 748, 755 (Pa. Super. 1999)).  Based upon this language, the district court in <u>Eastern Continuous Forms, Inc.</u>, 2004 WL 2418285, at *5, concluded that such an interest award is discretionary.

In <u>Frank B. Bozzo, Inc. v. Electric Weld Div. of Fort Pitt Div. of Spang Industries, Inc.</u>, 345 Pa. Super. 423 (1985), the Pennsylvania Superior Court observed that prejudgment interest is awarded as of right in those breach of contract cases where "the

69

breach was a failure to pay either a fixed sum or a sum mathematically ascertainable . . . .
[T]his is true even if there was a bona fide dispute as to the amount of the debt." Id., at
429-30.  Where, however, the "contract action is to recover an amount that is neither
liquidated nor ascertainable," id., at 430, then the award of prejudgment interest is
discretionary, to be allowed as "justice requires." Id., at 430-33.

Here, the amount due plaintiff MHR by HHCA was a fixed sum of
$850,000 due on July 19, 2004.  Since that date, the defendant has retained that sum and
benefitted by such retention.  The plaintiff is thus entitled to prejudgment interest at 6%
per annum, simple interest: the per diem rate is $139.73.  There are 907 days between July
19, 2004 and the date of judgment in this proceeding: January 12, 2007.  Therefore, the
plaintiff is entitled to prejudgment interest in the amount of $126,735.11.


B.


MHR's final contention is that it is entitled to attorney's fees pursuant to ¶
11.2 of the APA.  That provision states in part:

> Buyer's Obligation to Indemnify.  From and after the Closing,
> Buyer shall indemnify, defend and hold harmless Seller from
> and against any and all Losses arising out of, relating to or
> caused by, directly or indirectly, any or all of the following:
> ***
> (b) Any failure or refusal by Buyer to satisfy or perform any
> term, covenant or condition of this Agreement required to be
> satisfied or performed by Buyer . . . .

MHR notes that Paragraph 2.5 of the APA contains the Buyer's obligation
to pay the purchase price, including ¶ 2.5(c) (as modified by the first APA amendment)

70

which specifies the amount and timing of the Buyer's payment to the Seller after closing.

And Paragraph 1.1 of the APA defines "Losses" as "any and all Liabilities, costs and

expenses including costs of investigation, actual interest costs, penalties and attorneys'

fees."

The plaintiff construes these three APA provisions as requiring the

defendant to reimburse it for attorneys' fees incurred in connection with this adversary

proceeding.  Plaintiff's Post-Trial Memorandum at 4-5; see generally In re Eastern

Continuous Forms, Inc., 302 B.R. at 333.

On the issue of attorney's fees, the defendant counters, by emphasizing ¶

13.2 of the APA, which states:

> Expenses.  Whether or not the transaction contemplated by
> this Agreement shall be consummated, each Party shall pay its
> own expenses incident to preparing for, entering into and
> carrying into effect the Agreement and the transactions
> contemplated hereby including the fees and expenses of any
> advisor, accountant, attorney or other representative retained
> by it.

In general, Pennsylvania courts follow the "American rule that there can be

no recovery of attorneys' fees from an adverse party, absent an express statutory

authorization, a clear agreement by the parties or some other established exception."

Merlino v. Delaware County, 556 Pa. 422, 425 (1999).  HHCA suggests that ¶ 13.2

refutes MHR's position that the APA establishes a "clear agreement" to depart from the

American rule.

The post-trial memoranda of the parties do not address this issue in depth,

as both were awaiting the outcome of their dispute on contractual liability and damages.

71

Therefore, without now deciding whether the plaintiff is entitled to attorneys' fees, I shall

afford MHR the opportunity to request reimbursement of such fees and to establish their

reasonable amount, and HHCA the opportunity to oppose the plaintiff's request.  <u>See</u>

<u>generally</u> <u>In re Eastern Continuous Forms, Inc.</u>, 302 B.R. at 345.

      An appropriate order shall be entered.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                              :        Chapter 11

MEMORIAL HOSPITAL,                                 :
ROXBOROUGH
                    Debtor                         :        Bankruptcy No. 04-18933bif
_____

MEMORIAL HOSPITAL,                                 :
ROXBOROUGH
                    Plaintiff                      :
        v.
                                                   :
HOME HEALTH CORPORATION OF                                  Adversary No. 04-1059
AMERICA, INC.                                      :
                    Defendant
_____

.................................................

ORDER

.................................................

AND NOW, this 12th day of January 2006, for the reasons stated in the

accompanying opinion, it is hereby ordered as follows:

1. Judgment is entered in favor of the plaintiff and against the defendant in

the amount of $850,000 plus prejudgment interest in the amount of $126,735.11;

2. Plaintiff shall file and serve upon defendant any motion for

reimbursement of attorney's fees in connection with this proceeding, along with a

supporting memorandum, on or before February 12, 2007.  The defendant shall file and

serve its response, also with supporting memorandum, on or before March 1, 2007.

3. A hearing on the plaintiff's entitlement to attorney fees and, if so, the

reasonable amount of such fees, is hereby scheduled for March 28 , 2007, at 2:00 p.m. in

Bankruptcy Courtroom #2.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

E. Thomas Henefer, Esquire
Stevens & Lee, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103

Mark D. Pfeiffer, Esquire
Adelman Lavine Gold and Levin
Four Penn Center, Suite 900
Philadelphia, PA 19103-2808